Argued November 10, 1948; affirmed January 25;
rehearing denied March 8, 1949

GOUGE *v.* DAVID ET AL.

202 P. (2d) 489

*John D. Galey,* of Sweet Home, argued the cause for appellant. On the brief were Galey & Galey, of Sweet Home.

*James G. Smith,* of Portland, argued the cause for

respondent M. B. Hayden. With him on the brief was Robert F. Maguire, of Portland.

*George A. Rhoten,* of Salem, argued the cause for respondents Denver I. Young and Continental Casualty Company. On the brief were Rhoten & Rhoten, of Salem.

Before ROSSMAN, Chief Justice,* and LUSK,** BELT, BAILEY and HAY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff from a judgment of the Circuit Court in favor of the defendants, four in number, which was entered after the court had sustained a motion made by the defendants for a judgment of involuntary nonsuit. The action was instituted to recover damages, compensatory and punitive, for an instance of alleged malicious prosecution.

The appellant was the owner of a tavern in Silverton in which beer was sold and served. Defendant-respondent M. B. Hayden was the district attorney for Marion County, that being the county in which Silverton is situated. Defendant-respondent Denver I. Young was the sheriff for Marion County. Defendant-respondent Continental Casualty Company was the surety upon the official bond of Young. The status of defendant-respondent Victor David is not men-

---

\* Chief Justice when this case was argued.
\*\*Chief Justice when this opinion was rendered.

tioned in the record. The complaint averred that January 22, 1945, respondents David, Hayden and Young, acting together, made and filed in the Justice Court a complaint charging the appellant with the sale of alcoholic liquor without a license; that on the same day respondent Young, acting in concert with respondents David and Hayden, arrested the appellant on a charge of selling beer without a license; and that January 26, 1945, pursuant to a motion made by respondent Hayden, the criminal charge just mentioned was dismissed. The complaint averred that the acts of respondents David, Hayden and Young "were malicious and without probable cause." Damages aggregating $102,200.00 were sought against them, together with $10,000.00 against the Continental Casualty Company. The respondents admitted the arrest.

The sole assignment of error follows:
"The Court erred in granting the defendants' motion for non-suit and in entering judgment of involuntary non-suit."

The appellant's brief says:
"The trial Court granted the several motions of the defendants for judgments of involuntary non-suit after hearing the opening statements, an offer of proof by the plaintiff and a stipulation of certain facts. The basis of this ruling was the trial Court's conclusion that at the time of the arrest complained of the plaintiff did not have a license to sell beer. No other question was passed on by the trial Court."

The appellant presents no issue of procedure. He contends that at the time of his arrest he possessed an unwritten permit or license authorizing him to purvey beer, and that therefore the arrest was unlawful.

For several years the appellant operated establishments in which he sold and served beer. He concedes that his handling of beer was subject to the Oregon Liquor Control Act which was adopted in 1933; see Oregon Laws 1933, 2d S. S., Ch. 17. It appears in our compiled laws as §§ 24-101 to and including 24-149, O. C. L. A. Hereafter in our references to the act we will give only the section number. Since the arrest was made in January, 1945, we will confine our citations to amendatory session laws to those enacted prior to 1945.

Forming a part of the record are licenses issued to the appellant by the Oregon Liquor Control Commission (§ 24-104) beginning with the year 1937 when his tavern was in Portland. The licenses were issued under the provisions of § 24-118, subd. 10 (b) and subd. 11(b). They authorized him to sell packaged wines and beer for consumption on the premises. In 1940 he acquired a tavern in Silverton known as Kelly's Place and from then on the Commission, pursuant to his applications, issued to him the same kind of licenses as it had theretofore. December 6, 1944, the Commission received from the appellant applications for licenses of the kind above mentioned for the period ending December 31, 1945, and also the required amount of license fees ($100.00). Concurrently with its receipt of the license fees, the Commission issued a receipt upon which was this printed caveat:

"Note: This receipt is merely a statement of fees paid. All applications are accepted subject to consideration and final approval by the Oregon Liquor Control Commission."

Although the appellant had received no renewal license by January 1—at least none evidenced by a

writing—he continued to sell and serve beer until his arrest on January 22.

At its regular monthly meeting January 17, 18 and 19, 1945, the Commission gave attention to appellant's application. The minutes of the meeting, referring to the City Council of Silverton, recorded:

"The City Council refused to endorse the 1945 renewal application of Gouge."

We pause to take note of the fact that § 24-117 says:

"The Commission may require of every applicant for a license the recommendation in writing of * * * the city council * * * and the Commission may take such recommendation into consideration before granting or refusing such license * * *."

The aforementioned minutes also said:

"The files contained no letter of authorization from the City Council of Silverton showing that this application had been refused * * *. It was recommended by Commissioner Crooks that the license supervisor secure from the City Council of Silverton a written statement to the effect that they had refused to indorse this application for 1945. This matter is to be brought before the Commission at its next regular hearing."

A few days later, that is, on January 22, 1945, the arrest mentioned in the complaint occurred. The Commission's minutes for the monthly meeting held February 14, 15 and 16 say:

"The matter of Leonard Gouge, at Kelly's, 220 Oak Street, Silverton, was again brought to the attention of the Commission by the license supervisor. The case was continued for further investigation."

The minutes of the Commission for a special meeting held February 23 state:

"The matter of the renewal application of Leonard Gouge, retail beer B and package B, was given further consideration. Action had been held up pending the receipt of a letter from the City Council of Silverton stating that they would not indorse the application of Gouge for renewal. This matter was received by the Commission office and the Commission refused the renewal for lack of indorsement from the City Council."

March 14, 15 and 16 the Commission held its monthly meeting. From the minutes of that session, we quote:

"A hearing was granted to Gouge, licensee, represented by Mr. and Mrs. Gouge, who together with their attorney, John Steelhammer, appeared before the Commission requesting reconsideration of the action taken by the Commission at its special meeting held February 23, 1945, refusing retail beer license, Class B and package B. After reviewing the facts carefully, the Commission, by unanimous vote, rescinded its former decision and granted B and B licenses."

By way of summary, we see that (1) the appellant held proper licenses for the year 1944 and before the end of the year filed applications for renewal licenses for the year 1945, concurrently paying the Commission the required fees; (2) January 17, 18 and 19, the applications were considered by the Commission, but action was deferred until a future meeting; (3) January 22 the arrest mentioned in the complaint was made; (4) the Commission, at its regular February meeting, again deferred action upon the appellant's applications; (5) February 23 the Commission, at a special meeting, refused to grant the requested licenses; and (6) at its March meeting the Commission

reconsidered the action taken February 23 and ordered the issuance to the appellant of the licenses for which he had applied.

Before delineating additional circumstances, we take note of the fact that it is a misdemeanor for anyone to engage in the business which the appellant was pursuing without possessing a license issued by the Commission: § 24-137, as amended by Oregon Laws 1943, Ch. 108. Licenses issued by the Commission expire December 31 at midnight: § 24-121. The appellant does not argue that his 1944 license was still valid January 22, 1945. The brief of his counsel says:

"The appellant does not contend that his 1944 license was in effect at the time of his arrest."

Therefore, we can ignore the 1944 license in ascertaining whether, at the time of his arrest, the appellant possessed a license authorizing him to purvey beer. The appellant argues that the Commission employed an unwritten practice whereby those who applied for a renewal license before the expiration of an existing one were deemed licensed from midnight December 31 until action was taken upon the renewal application. Based upon that premise, the appellant states that he "was licensed for 1945 from January 1, 1945, until the renewal was refused by the Commission on February 23, 1945."

The facts upon which the appellant grounds the contentions just mentioned are stated in some passages of his brief which we now quote:

"The delay in the delivery of the written and printed certificates of license was a common occurrence and occurred as to many applications for renewals of 1944 licenses for the year 1945 in Marion County, Oregon.

"The plaintiff offered evidence that the unvarying rule, policy and practice of the O. L. C. C. since its inception had been, and in January, 1945, was to consider and to treat as duly licensed all applicants for renewals of existing licenses who had paid the required fees until such time as their applications for renewals of their licenses should be finally denied, if that should ever occur; and that this rule, policy and practice, although not a published regulation nor evidenced by minutes of the Commission had long been known to and relied upon by the numerous licensees of the Commission, including many in Marion County and including the plaintiff. This rule, policy and practice was recognized in the instant case by the defendant Hayden and by the Court which dismissed the complaint upon which plaintiff was arrested.

"Having made due application for his 1945 license renewal the plaintiff continued to operate 'Kelly's Place' after the first of the year 1945, although he had not yet received the printed certificates of license from the Commission. On January 22, 1945, plaintiff was arrested for selling beer without a license. It is conceded that on that occasion his place of business was open for the purpose of selling beer. The arrest was made pursuant to a complaint which plaintiff alleges was made by the defendants David, Young and Miller Hayden, acting in concert."

Evidence in support of the alleged practice, had it been received, would not have come from any of the three commissioners, but from members of the Commission's staff. According to the stipulation, Mr. Ernest Jachetta, former counsel for the Commission, Mr. Robert Boyd, who was then the Commission's counsel, and Mr. Oren Campbell, chief license supervisor for the Commission, would have given the evidence. Mr. Campbell would have testified that the

practice described in the foregoing quotation was deemed essential, "otherwise large numbers of licensees of the Liquor Control Commission, not only in retail, but as well in wholesale and some other branches, would have had to close their doors on the 2d of January of any given year, except for the license and permission thus informally granted." It seems permissible to infer that the practice upon which the appellant relies developed because the Commission could not, before January 1, dispose of all the license applications received at the close of the year. Therefore, the administrative staff did not compel those whose renewal applications were still pending December 31 to lock doors at the close of that day and desist from purveying beer until a renewal license was granted.

In order to gain a correct conception of the practice upon which the appellant depends, it is necessary to take notice of the fact that the records of the Commission contain no written evidence of any action by the Commission that instituted or countenanced the practice. The appellant conceded that the Commission had not adopted a rule or regulation that authorized an applicant for a renewal license to continue the sale of beer after the expiration of his current license and until the Commission acted upon his renewal application. While the matter was being presented in the trial court, the presiding judge pointed out to appellant's counsel that he had offered nothing indicating that the practice was recognized by the commissioners themselves. Thereupon appellant's counsel said:

"Well, your Honor, I can't tell you of any resolution. As a matter of fact, I inquired specifically of Mr. Boyd. I think I made the same specific in-

quiry of Mr. Jachetta. I am not so sure as to the latter, but I recall plainly asking Mr. Boyd, ''Was there ever a resolution, a minute entry, saying ''That is how we instruct our people to act.'' or ''That is how we act.'' or words to that effect? He told me, so far as he knew, there was none.''

Following the arrest of the appellant on January 22, Mr. Ernest Jachetta, who was then the attorney for the Commission, wrote to the respondent, Miller Hayden, a letter, dated January 25, 1945, which said:

''On the 19th day of January, 1945, the Oregon Liquor Control Commission at its regular monthly meeting considered the renewal application for a 1945 retail beer 'B' license and the renewal application for a 1945 package store class 'B' license of Leonard Gouge covering those premises known and described as Kelly's, 220 Oak Street, Silverton.

''After due deliberation, the commission decided that this matter be held over until the next meeting for the purpose of conducting a further investigation. In the meantime, Mr. Gouge has been permitted to operate his business under a temporary permit.

''It has been the rule and policy of the commission ever since its inception to permit such applicants under similar circumstances to continue with the operation of their business upon filing their renewal applications accompanied by the required fees. The records on file with our office show that Mr. Gouge has complied in this regard.

''However, the commission has been advised that there appears to be some misunderstanding regarding the commission's ruling as far as it relates to Mr. Gouge as Mr. Gouge was recently arrested for operating his establishment without a license from the commission.

''The purpose of this letter is to clarify this situation and to advise you that as far as the Ore-

gon Liquor Control Commission is concerned, the applicant Leonard Gouge, has the authority of the commission to operate until such time that he may be advised to the contrary. Therefore, the writer urges you to make such disposition of the pending case in line with the ruling of the commission as hereinbefore stated.''

Promptly upon his receipt of that letter, respondent Hayden moved the Justice Court to dismiss the complaint that had been filed against the appellant. The motion was sustained.

We think that the foregoing is a sufficient review of that part of the record which indicates whether or not the appellant, at the time of his arrest, possessed a license issued by the Commission. If the appellant did not then have a valid license, he was guilty, as previously indicated, of a misdemeanor; in that event, it was the duty of respondent Young, as sheriff, and of respondent Hayden, as district attorney, to arrest the appellant: § 24-141.

The Oregon Liquor Control Commission is an administrative agency of this state. Its domain is the liquor traffic. In that province it is the working arm of the state. Its powers are varied and great. Unlike the State Tax Commission, which is a revenue agency, the Oregon Liquor Control Commission is primarily a regulatory body. Section 24-102 says, in part:

"This act shall be deemed an exercise of the police powers of the state.''

See City of Coos Bay v. Eagles Lodge, 179 Or. 83, 170 P. 2d 389. In conferring authority upon the Commission, the legislature dipped deeply into the executive, legislative and judicial phases of the governmental power and gave to the Commission parts of each.

The Commission has the power to write rules and regulations (§ 24-106, subd. (h)) which, when published in the manner prescribed by § 24-108, have the effect of legislative-made criminal enactments: § 24-106, subd.(h). The Commission has the power "to issue subpoenas, compel the attendance of witnesses, administer oaths, certify to official acts, take depositions * * *, compel the production of pertinent books * * * and testimony": § 24-110. Findings and orders entered by the Commission possess sufficient of judicial nature so that those designated in § 24-127 may be reviewed upon appeal by the Circuit Court.

Thus, we see that the Commission can write rules which, upon publication, have the effect of law, and that it possesses some of the powers which generally are a part of only a court's vestment. Although those phases of the Commission's armament are impressive, it is evident that the extensive administrative powers with which the Commission is endued are the ones intended to enable it to render yeomanly service. We shall leave uncited many provisions which confer important administrative powers upon the Commission and go on to those that enable it to license virtually everyone who sells, buys, blends, possesses, distills, manufactures, etc., alcoholic beverages. "Licensing", according to Final Report of the Attorney General's Committee on Administrative Procedure, p. 13,

> "is one of the most significant of all preventive devices. * * * Licensing of any activity may be one of the most burdensome forms of regulation, since all who engage in the activity must be licensed in order that the persons who would probably act improperly may be controlled. But it is also one of the most effective, * * * ."

■ The licensing power, when conferred by statute upon a department of government, is generally deemed executive or administrative in nature: Benjamin, Administrative Adjudication, p. 68. The Oregon Liquor Control Act makes provision for a comprehensive system of licenses. Section 24-106 says:

"The function, duties and powers of the commission shall include the following: * * *
"(e) To grant, refuse, suspend or cancel licenses and permits.* * *."

Sections 24-116 to and including 24-118, enumerate the kind of licenses which the Commission may issue to those who engage in the use, sale, manufacture, etc., of liquor; § 24-118 alone lists 22 types; § 24-119, in addition to authorizing the Commission to exact from an applicant sufficient information to enable it to know whether a license should be issued, says:

"No license shall be granted or renewed until the provisions of this act, and the regulations of the commission shall have been complied with."

■ In other words, licenses are issued, not as a matter of course, but through the exercise of the Commission's informed judgment. Section 24-121 renders certain that no unsuitable person will gain a license by purchase of one issued to a qualified person, for it says:

"Any license granted under this act shall be a purely personal privilege * . * * and shall not constitute property, nor shall it be subject to attachment or execution, nor shall it be alienable, * * * ."

In order to compel the Commission to review annually the suitability of every licensee for the continued privilege of dealing in alcoholic beverages, the act terminates every license on "December 31 of each

year at twelve (12) o'clock midnight.'' Section 24-120 enumerates the grounds which authorize the refusal of a license, and § 24-122 lists the circumstances under which the Commission may cancel or suspend a license. Those who purchase alcoholic liquor from the Commission must possess a license (permit) renewable annually: § 24-123, as amended by Oregon Laws 1943, Ch. 444. The permits are subject to revocation for cause: §§ 24-125 and 24-126.

We took note of the foregoing potent provisions, not for the primary purpose of making an analysis of the act, but in order to direct attention to the manifest importance which the legislature attached to the act's subject matter. Section 24-102, from which we quoted, says:

"It hereby is declared that the subject matter of this act involves in the highest degree the economic, social and moral well-being and the safety of the state and all of its people.''

In order to preserve and promote "the economic, social and moral well-being'' of the people, the act created the Commission, and, as we said, made it a working arm of the state. It put into the sinews of that arm the licensing prerogative in its most effective form.

The specific issue involved in this appeal is whether or not the Commission possesses the power to issue a blanket license to all whose applications for renewal licenses are pending at midnight December 31.

In endeavoring to sustain his position that the Commission can lawfully grant to all whose applications for renewal licenses are pending December 31 temporary licenses until the Commission has acted

upon their applications, the appellant argues that this court should defer in its interpretation of the statute to the one evidenced by the practice we have described.

■■■ The decisions recognize that the interpretation of an ambiguous statute by an agency charged with its administration, although not binding upon the courts, is entitled to their careful consideration. They also recognize that agency interpretations may be manifested in different ways and that their weight varies with the method pursued in reaching the construction. An interpretation may be made either by the agency heads in the course of inter partes proceedings or through the routine pursued by officials in the employ of the agency to whom was entrusted enforcement of the act. Constructions manifested in the way last mentioned possess less weight than those announced at the close of inter partes proceedings: *Fishgold v. Sullivan Drydock & Repair Corp.*, 154 Fed. 2d 785, affirmed in *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U. S. 275, 90 L. Ed. 1230, 66 S. Ct. 1105, 167 A. L. R. 110. All are familiar with the rule that the meaning of unambiguous language can not be disturbed by judicial interpretation: *Fullerton v. Lamm*, 177 Or. 655, 163 P. 2d 941, 165 P. 2d 63; *Inwall v. Transpacific Lumber Co.*, 165 Or. 560, 108 P. 2d 522; *Banfield v. Schulderman*, 137 Or. 167, 296 P. 1066, 298 P. 905, 89 A. L. R. 504. An administrative agency, no less than a court, is bound by the rule given to us in § 2-216, which says:

> "In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; * * * ."

The courts apply to agency construction the same rule that they apply to themselves: An administrative agency can not construe statutes which need no construction, and can not alter the meaning of unambiguous passages: *State ex rel. Galloway v. Watson,* 167 Or. 403, 118 P. 2d 107; *Twohy Bros. Co. v. Ochoco Irrigation District,* 108 Or. 1, 210 P. 873, 216 P. 189. The courts hold that even if an act is expressed in clear language, a conclusion may be warranted that an ambiguity exists if literal interpretation will produce an absurd result or one at variance with the policy of the legislation as a whole: *United States v. American Trucking Assn.,* 310 U. S. 534, 84 L. Ed. 1345, 60 S.Ct. 1059; *Fox v. Galloway,* 174 Or. 339, 148 P. 2d 922.

Let us now see from the words of the appellant himself wherein he claims that the Oregon Liquor Control Act is ambiguous and needs construction. As we have observed, agency construction is permissible only when the act which the agency administers is susceptible to more than one reasonable interpretation. The appellant's reply brief, in arguing that the Liquor Control Act contains ambiguities, says:

"For example, if, as respondent contends, Section 24-121 forbids the commission to issue licenses for less than a full year, what effect is to be given to these provisions of the act?

"(a) The 'per day' license provision of Section 24-119.

"(b) The provision of Section 24-119 for less than a full year's license fee.

"(c) The provision of Section 24-106 (e) for granting licenses and permits for the sale of liquor.

"(d) The provision of Section 24-106(i) granting to the commission 'all powers incidental, convenient or necessary to enable it to administer or

carry out any of the provisions of this act' and the similar language of Section 24-106(i).

"(e) The language of Section 24-117 that 'The Commission shall provide for licensing . . . . ' If the statute is complete and unambiguous what is there to 'provide for'?

"(f) The recognition in the language of Section 24-119 that a license may be either 'granted' or 'renewed'.

"(g) The phrase in Section 24-119 that the specified fee, which in this case had been paid by the appellant and retained by the commission, shall be paid 'upon the granting of a license.'"

The foregoing, according to our reading of the appellant's briefs, is an enumeration of every provision of the act upon which he depends to show that the act contains incongruities.

We think that the first sentence of the quoted paragraph misstates the respondents' position. According to our understanding, the respondents do not contend that "§ 24-121 forbids the commission to issue licenses for less than a full year." The brief of respondent Hayden, referring to § 24-121, says:

"There is no provision in this section, or in any other section of the act, which by any presumption can be construed as authorizing or empowering the commission to issue licenses for any period other than for the year in which issued or which expire at any time other than December 31 at the hour of twelve o'clock midnight. Likewise, there is no provision in the act which either directly or indirectly authorizes or empowers the commission to issue temporary permits of any kind whatsoever. * * *

"While it might serve to expedite the work of the commission if it were permitted to issue tem-

porary licenses covering the period while it is reviewing, investigating and passing upon applications for renewal of licenses, the fact remains that the act does not vest it with any such power or authority.''

■ The other respondents take the same position. Although that language is not free from ill-chosen words, its meaning is manifest. According to the quoted language, the act confers upon the Commission (1) no authority to issue licenses valid for more than one year; (2) all licenses must expire December 31, regardless of when issued; and (3) the Commission can not issue temporary licenses valid for the period in which the Commission has a renewal application under consideration.

We shall now analyze appellant's statement for the purpose of determining whether it shows that the act contains contradictory or ambiguous terms. In proceeding with the analysis, we shall bear in mind the fact that § 24-121 is applicable to all licenses issued by the Commission. It says:

"Any license granted under this act shall be a purely personal privilege, good for the year in which issued, and ending on December 31 of each year at twelve (12) o'clock midnight, * * * .''

The act contains no provision that all licenses must run for a year. Although it contains no such demand, it, nevertheless, requires that every license issued by the Commission must expire not later than midnight December 31. Thus, although the act does not set a minimum upon the length of a license, it fixes one year as the maximum term.

■ We now revert to the statement we quoted from

appellant's brief. The part of § 24-119 mentioned in subd.(a) of his statement says:

"A special retail beer license may be issued for any picnic, convention, fair, civic or community enterprise at the rate of $5.00 per day."

The purpose of that simple provision is obvious. The license, as the quoted sentence says, is "a special" one. Since the special license can be valid for only one day, it is bound to terminate not later than December 31. The part of § 24-119, to which subd.(b) of the statement refers, says:

"Provided, however, that as to any license granted subsequent to January of any year, the license fee payable shall be the proportionate part of the remainder of the year computed on a quarterly basis."

That provision, like the all-pervading language of § 24-121, requires all licenses to expire at midnight December 31, but exempts those who set up a business after the first quarter of the year from the obligation to pay a whole year's license fee. The part of § 24-106(e) mentioned in subd.(c) of the above-quoted statement, says:

"To grant, refuse, suspend or cancel licenses and permits for the sale or manufacture of alcoholic liquor or other licenses and permits in regard thereto * * * ."

█ The appellant finds significance in the word "permit" and seems to believe that it means that the Commission can, in lieu of granting a license, issue a permit. If that is what the language means, the appellant has been unable to find any provision that specifies what kind of permit may be issued. As we

have seen, no one can purchase liquor from the Commission without first securing a permit. That requirement is made by § 24-123 as amended by Oregon Laws 1943, Ch. 444. We think that subd.(e) of § 24-106, when it mentions permits, has reference, not to a vendor's permit, but to a purchaser's permit.

We now come to subd.(e) of the paragraph we quoted from the appellant's brief. Seemingly one of the references in that subdivision to § 24-106(i) should be to § 24-105. Sections 24-105 and 24-106(i) do not have the effect of placing the entire law at large and of thereby authorizing the Commission to exercise an unbridled discretion. A statute which creates an administrative agency and invests it with its powers restricts it to the powers granted. The agency has no powers except those mentioned in the statute. It is the statute, not the agency, which directs what shall be done. The statute is not a mere outline of policy which the agency is at liberty to disregard or put into effect according to its own ideas of the public welfare. Sections 24-105 and 24-106(i) are intersticial in their operations and not unlike the implied powers of an agent. We come now to subd. (e) which quotes from § 24-117 the following:

"The Commission shall provide for the licensing as herein provided of persons and of incorporated cities and towns * * * .":

The appellant infers that the words "provide for the licensing" confers upon the Commission some unexpressed power to issue licenses which are unmentioned in the act. A license under this act does not issue automatically. When an application is received, some one in the agency must go to work. The quoted

language invests the Commission with power to provide for the mechanics of issuing licenses. Subd. (f) of appellant's quoted statement dwells upon the fact that § 24-119 employs the words "granted" and "renewed". The situation of a person who applies for a license may be different from that of one who seeks a renewal. Possibly the former has made no financial investment in his contemplated business venture, whereas the other who applies for a renewal may have considerable at stake. The former may be a stranger to the Commission, whereas the one who applies for a renewal has already identified himself. Presumably, those situations account for the alternative language, but, obviously, those words do not authorize the Commission to grant to the one a kind of license that is unavailable to the other. The last of the subsections, being (g), refers to the fact that § 24-119 provides that the license fee shall be paid "by each applicant upon the granting of a license." We fail to find in that circumstance anything which discloses in the act an ambiguity.

We went through the foregoing for the purpose of ascertaining whether the parts of the act cited by the appellant show that the measure is incongruous and contradictory. We found no ambiguous terms and nothing that requires construction. In our opinion, the act clearly states that all licenses must expire December 31. With like clarity it provides that although a license may be issued for as short a period as one day, none can be good for more than a year. Since the license fee that must be paid is graduated according to the period of time for which the license is issued, it necessarily follows that no license can be granted for an indefinite or non-prescribed period. If the li-

cense fee was not paid when the application was presented, payment must concur with the issuance of the license. No license can be issued except by the Commission, and before any is issued the Commission must see to it that "the provisions of this act and the regulations of the commission, shall have been complied with." The quoted words were taken from § 24-119. They demand that the issuance of a license must be a deliberate act; that is, the application and other relevant papers must be perused and judgment must be exercised: *Olds v. Kirkpatrick,* (Or.), 191 P. 2d 641. The payment of the license fee into the Commission's coffers does not cause a license to come forth in the manner of a coin-operated machine. This is not a revenue measure. Although we have said that it is the Commission that must issue licenses, we do not mean that the three commissioners must give personal attention to every application. The act itself says: "The commission shall provide for the licensing as herein provided of persons and * * * ." Thus, the Commission can avail itself of the assistance of a staff, but no license can be granted except as the result of a course of operations that the Commission itself prescribed.

The appellant argues:

"The Liquor Control Act was passed in the second special session of 1933 (L. 1933 (2d S. S.), ch. 17). Appellant's arrest occurred while the 1945 session of the Oregon legislature was sitting. Thus, including the 1945 session, the legislature met six times after the commission had commenced the continuous use of its practice concerning renewal licenses, which began when the commission first started to operate under the act. In none of these sessions was the language of Section 24-121, O. C.

L. A., changed except in the Laws of 1937, Chapter 448, Sec. 12, p. 748, which changed only the language of the proviso and that not in a manner which at all affects the meaning of what precedes it.''

■ Thus, there is no contention that the act was re-enacted after the purported administrative construction was made. Further, we know of nothing in the record that indicates that the legislature has been familiar with the practice upon which the appellant relies. There is no occasion, therefore, in this case for employing the recension enactment rule which takes the view that agency construction has the force of law if a statute is re-enacted after (1) the agency charged with its administration construed it, and (2) the legislative body was familiar with the construction when it re-enacted the statute: *Brooks v. Dewar,* 313 U. S. 354, 85 L. Ed. 1399, 61 S. Ct. 979; *Helvering v. Reynolds Co.,* 306 U. S. 110, 83 L. Ed. 536, 59 S. Ct. 423; *Railway Labor Executives' Assn. v. United States,* 38 Fed. Supp. 818.

■ Finally, in support of the aforementioned practical construction of the act, the appellant claims that it would be impossible to issue all renewal licenses before January 1; he adds: ''The administrative confusion and serious public inconvenience which would follow from such a construction of the act are self-evident.'' Based upon that premise, the appellant urges that the practical construction ought to be accepted. There is nothing in the record that discloses the number of renewal applications pending December 31, 1944, or at any other time. The appellant's 1944 license is before us as one of the exhibits. On its face is this statement: ''The Commission does hereby license the undersigned applicant * * * until twelve

o'clock midnight, December 31, 1944." Accordingly, the appellant had before him constantly throughout 1944 a reminder that his license would expire December 31 and that if he wished to continue in business in 1945 a new license for the period beginning January 1 was essential. He also must have possessed the knowledge of which he asks us to take judicial notice, that the Commission possibly would not be able to issue to all applicants renewal licenses if all waited until the end of the year before applying. Moreover, he must have known that delays in the issuing of licenses might be caused by the very circumstance that caused his delay—the unfavorable attitude of the local city administration. No one has a constitutional right to engage in the liquor traffic, and, accordingly, the appellant is in no position to insist that the Commission owed a duty to issue all renewal licenses before January 1, regardless of circumstances. So far as we can determine from the record, the tardy issuance of the appellant's renewal license was not due to any fault of the Commission.

■ But, even if we believed that the act is unworkable and that "serious public inconvenience" would result therefrom, we could not relieve the situation. We have no legislative power and, therefore, can not rewrite the act. Nor can we overcome our lack of legislative power by resort to misconstruction of the plain language of the act. The latter requires (1) a license as a prerequisite to any sale of liquor; (2) the license must be issued by the Commission as a deliberate act based upon a consideration of the licensee's application and all relevant facts; and (3) no license can be issued until the Commission has seen to it that all "the provisions of this act, and the regulations of the

commission, shall have been complied with." It was the legislature that inserted those provisions in the act, and we are powerless to delete them. We would be equally powerless to remove them even if it appeared that their presence in the act rendered it unworkable. See *Layman v. State Unemployment Comp. Com.*, 167 Or. 379, 117 P. 2d 974, 136 A. L. R. 1468.

■ We have carefully considered the appellant's contentions that the practice described in preceding paragraphs shows that the Commission construed the act to mean that the receipt possessed by an applicant for a renewal license is a permit which authorizes him to continue his business until the Commission takes formal action upon his application. We are convinced that if the Commission had attempted to adopt a rule or regulation to that effect it would have been invalid. Administrative rules and regulations can go no further than fill in the interstices of the dominant act. They can not overcome and override any of its provisions. Since the Commission could not have done directly what the appellant claims it attempted through the purported practice, it could not have done it indirectly. If the purported practice existed, it was unlawful. It is our duty to disregard it.

The plaintiff argues that since he applied for renewal licenses, paid the Commission the required fees and was given a receipt, the latter operated as a license. He cites *State v. Gish*, 168 Ia. 70, 150 N. W. 37, Ann. Cas. 1917B 135; *United States v. The Planter* (Case No. 16,054), 27 Fed. Cas. 544; *City of Boston v. Shaffer*, 26 Mass. 415; *Feigenspan v. Mulligan*, 63 N. J. Eq. 179, 51 Atl. 191; *Fouts v. State* (Tex. Cr.), 101 S. W. 223; *Hartford Fire Insurance Co. v. Peoria*, 156 Ill. 420, 40 N. E. 967; *Connecticut Breweries Co.*

*v. Murphy,* 81 Conn. 145, 70 Atl. 450; *Siegel v. Mangan,* 258 App. Div. 448, 16 N. Y. Supp. 2d 1000; *State v. Watson,* 5 Blackf., Ind., 155.

In the Gish case, the defendant was accused by the State of having operated a motor vehicle without displaying the current license plates. The accused had properly registered his car, timely applied for new plates and paid to the Secretary of State the required fee. The reason he did not display plates for the current year was because the Secretary of State was unable to make delivery. The court, in holding that the defendant's continued operation of his car was not a violation of the statute, said:

"The manifest purpose of requiring registration and the display of official number plates is (1) to accomplish in advance the collection of the license or registration fee, and (2) to furnish a means of identification of the vehicle. The preeminent purpose, however, of requiring annual reregistration and annual number plates (which is the requirement involved in the case at bar) is to accomplish the collection of the annual fee. Identification is not aided by mere re-registration or by a *change* of numbers or plates."

The Planters case was based upon a libel for operating a boat without a license. The answer averred that a license had not been issued by the official. The facts were that the license had, in fact, been executed, sealed, signed, dated and numbered, but not delivered. The court held that delivery was not essential.

The City of Boston case was an action to recover from the proprietor of a theater a license fee of $1,000 imposed by the city upon theater operators. The theater proprietor argued that since the license was

not delivered, he was not liable for the fee. The contention was resolved adversely to the proprietor, the court saying:

> "No formal, written license was given to the defendants, but that is not material; for there was a vote of the city that the license to the theatre should be renewed, on the proprietors giving bond and paying $1000 a year, and the defendants have proceeded as under a license."

The Feigenspan decision held, as the appellant's brief points out, that the words "liquor license" may designate either the permission to sell liquor or the paper writing which usually, but not necessarily, evidence such license.

In the Fouts case the defendant had been convicted of practicing medicine without having paid a tax exacted by statute from all physicians who traveled as specialists. The statute was a revenue measure. The defendant argued that the act was invalid because the required license was not described in the statute. In rejecting that contention, the court said:

> "Unless the law specifically prescribes what a license is, or may contain, a receipt for the occupation tax is regarded as a license."

Attention should be given to the fact that, as stated in the quoted language, the statute imposed an occupation tax.

The Hartford Fire Insurance Company case was based upon a tax of two per cent. levied by an ordinance of the city of Peoria upon all fire insurance premiums collected by agents. The appellant cites the case as support for his contention that the receipt

held by him was, in fact, a license. We quote from the decision:

> "When the charges provided for in the ordinance have been paid for the past six months' business, the city clerk is 'authorized to issue a license to such insurance company setting forth the time for which it is granted and the amount of such payment.' The use of the word 'license' in this connection means no more than a receipt for the payment, stating what it is for. It protects the person, agent or solicitor against the penalty pronounced against him for not rendering the account or failing to make payment, and the corporation from further liability."

It is obvious that the ordinance employed the word "license" as synonymous of "receipt". The latter, which was issued at the close of six months' business, was not in fact a license at all, if the latter means authority to engage in a future course of operation.

The part of the Connecticut Breweries Company decision which the appellant deems material is the following:

> "The word 'license' is used in the statute to signify the intangible right granted to the licensee as well as to signify the writing signed by the commissioners which is the instrument and evidence of that grant."

In other words, that holding and the one in the Feigenspan decision are companions.

The part of the Siegel decision upon which the appellant relies is:

> "But, assuming the section does apply, it provides in part: 'The department shall, unless it deems other procedure advisable, issue a license

to every person certified by the board as entitled
to receive it.' There is nothing in such language
prohibiting the Department from establishing a
practice of having licenses signed by the board of
examiners.''

In other words, the court held that after the depart-
ment of education found that the petitioner was en-
titled to a license, it could authorize its board of exam-
iners to sign the license.

The appellant seems to believe that the last of the
aforementioned decisions, *State v. Watson,* holds that
either a licensing board or its secretary may grant a
license. The decision is brief and the part which con-
cerns appellant's contention is:

"The act of 1832 'to license and regulate tav-
erns and groceries' prescribes the requisites which
shall entitle a person to the privilege of selling spir-
itous liquors. That privilege is obtained either by
application to the board of county commissioners
while in session, or to the clerk in vacation. If the
privilege be granted by the board, it is called a
license; if by the clerk, a permit is given to retail
until the next meeting of the board.''

Thus the decision, in making the statement upon which
the appellant relies, was doing no more than para-
phrase the statutory language.

It may be that if the provisions of the Oregon Li-
quor Control Act which require licenses were intended
for revenue purposes only, the Fouts, The Planters
and the City of Boston decisions would be relevant
to the issues before us. But the Liquor Control Act
is a regulatory measure. The Gish case seemed to turn
upon the revenue features of the act. The Feigenspan

and the Connecticut Breweries decisions were concerned with the problem whether the paper or the right was meant when the word "license" was used. That problem does not concern us. In the Hartford Fire Insurance Company case the ordinance used the word "license" as the equivalent of "receipt". It is certain that the Liquor Control Act uses the word "license" in its orthodox sense. The Siegel decision held that a license department need not sign the license and may authorize the signature of the examiners. The appellant possessed no 1945 license and, hence, that distinction is not material to this case. *State v. Watson* went no further than to recount the words of the controlling statute. We have found nothing in those decisions which warrants a conclusion that the appellant's possession of a receipt for his 1945 license fee was a license. This is a regulatory, not a revenue, measure.

■■ Plainly, the Oregon Liquor Control Act prohibits everyone from entry into the liquor traffic until the Commission approves his application and issues to him a license. A license is an indispensable precursor to the opening of the doors of a tavern or other place where the proprietor intends to purvey alcoholic beverages. It seems permissible to infer from the record that the unfavorable attitude of the Silverton city council caused the Commission to defer action in 1944 upon the appellant's renewal applications, with the result that on January 1, 1945, he possessed no licenses. The receipt given to him when he applied for his 1945 licenses and paid the license fees was not a license. It itself said: "This receipt is merely a statement of fees paid." Payment of the license fees was essential to his continuance in business, but payment alone did not suf-

fice—he needed a license. When the respondent sheriff entered the appellant's tavern January 22, 1945, the appellant had a stock of beer and some thirsty customers who were quaffing his merchandise, but he was unable to display a license because he possesed none. His arrest was lawful.

The assignment of error is without merit. The judgment of the Circuit Court is affirmed.