Argued September 6, reversed September 20, petition for rehearing
denied October 31, 1961

# VAN RIPPER *v.* OREGON LIQUOR CONTROL COMMISSION

### 365 P. 2d 109

*Francis T. Wade,* Assistant Attorney General, Portland, argued the cause for appellants. With him on the brief was Robert Y. Thornton, Attorney General of Oregon, Salem.

*James M. Burns,* Portland, argued the cause for respondent. With him on the brief was Harold L. Davidson, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Oregon Liquor Control Commission (ORS 471.705), from a decree of the circuit court which ruled that (1) a regulation adopted by the commission May 10, 1960, known as Regulation 17, was "void and without effect"; (2) action taken by the commission October 12, 1960, which cancelled the plaintiff's dispenser's license (Class "B") for his violation of Regulation 17 was unauthorized and (3) the commission should reinstate the license.

The defendant (the commission) presents a single assignment of error which reads:

"The Circuit Court erred in decreeing: that the

Oregon Liquor Control Commission acted without authority of law in adopting its Regulation 17; that said regulation is void and without effect; that, consequently, the Commission abused its discretion in revoking plaintiff's license; and that the Commission reinstate fully said license."

The plaintiff is the owner of an establishment in Portland known as "Van's Olympic Room" which he terms "a night club." In it he sells liquor by the glass and a tenant of his serves food. Entertainment for the guests is provided. The establishment is licensed by the defendant.

This proceeding had its inception September 14, 1960, when the commission charged the defendant "with a violation of Section 1 of Commission Regulation 17 in that during the sixty-day period ending August 31, 1960, the gross receipts from the sale of food in your licensed establishment amounted to less than twenty-five percent of the gross receipts from the sale of both food and alcoholic liquor." The plaintiff was afforded a hearing upon the charge September 26, 1960, in the course of which both he and the commission presented evidence. After the close of the hearing the commission entered findings of fact, two of which read:

"3. That during the sixty-day period ending August 31, 1960, the gross receipts from the sale of food by said licensee in his licensed commercial establishment amounted to the sum of $263.80, constituting 2.1% of the gross receipts from the sale of both food and alcoholic liquor therein, which amounted to the sum of $12,833.35 during the same period.

"4. That the kitchen and restaurant of the licensee are leased to and operated by an individual who is a stranger to the license, and thereby the business of selling and serving alcoholic liquor

had become and is separate from that of cooking and serving food."

October 12, 1960, the commission entered an order which cancelled the plaintiff's license effective October 31, 1960. From the order the plaintiff appealed to the circuit court (ORS 472.190) which held Regulation 17 invalid. The trial judge stated:

"* * * The requirement of twenty-five per cent gross sales to be in food would be adding another additional requirement to a Class B or C license, or whatever this is, something the statute does not require. They say that in addition to the statutory requirements 'We, the Commission, suggest that and decree that they must sell twenty-five per cent gross sales, income, must be from sales of food,' going beyond the authority the Commission possesses under the general aspects of the act and the general authority conferred by the statute. It is in the nature of an assumption of legislative authority * * *."

The facts pertaining to this case are free from dispute. The ruling of the circuit court which held Regulation 17 invalid was not based upon a belief that the regulation was adopted in an irregular manner, but, as we saw from the declaration of the trial judge, just quoted, it was based upon a persuasion that the commission had no authority to demand that the sales of food by a licensee must have a ratio of not less than 25 per cent to his total sales.

November 4, 1952, Oregon amended its Constitution by including in it the following which has become Article I, § 39:

"The State shall have power to license private clubs * * * and commercial establishments where food is cooked and served, for the purpose of selling alcoholic liquor by the individual glass at retail, for consumption on the premises, includ-

ing mixed drinks and cocktails, compounded or mixed on the premises only. The Legislative Assembly shall provide in such detail as it shall deem advisable for carrying out and administering the provisions of this amendment and shall provide adequate safeguards to carry out the original intent and purpose of the Oregon Liquor Control Act, including the promotion of temperance in the use and consumption of alcoholic beverages * * *.

"(2) Legislation relating to this matter * * * shall be liberally construed for the accomplishment of these purposes."

ORS 471.030 (1) provides:

"The Liquor Control Act shall be liberally construed so as:

"(a) To prevent the recurrence of abuses associated with saloons or resorts for the consumption of alcoholic beverages.

"(b) To eliminate the evils of unlicensed and unlawful manufacture, selling and disposing of such beverages and to promote temperance in the use and consumption of alcoholic beverages.

"(c) To protect the safety, welfare, health, peace and morals of the people of the state."

ORS 471.040 says:

"The commission has the powers and duties specified in this chapter, and also the powers necessary or proper to enable it to carry out fully and effectually all the purposes of this chapter. * * *"

We now quote from ORS 471.730:

"The function, duties and powers of the commission include the following:

* * *

"(5) To adopt such regulations as are necessary and feasible for carrying out the provisions of this chapter and to amend or repeal such regulations. When such regulations are adopted they shall have the full force and effect of law.

"(6) To exercise all powers incidental, convenient or necessary to enable it to administer or carry out any of the provisions of this chapter."

ORS 472.030, which is a part of the chapter known as "Sale of Alcoholic Liquor by Individual Drink," declares:

"This chapter shall be deemed an exercise of the police powers of the state for the protection of the safety, welfare, health, peace and morals of the people * * * to provide for the sale of alcoholic liquor as provided for by section 39, Article I, Constitution of Oregon, * * * to eliminate the evils of unlicensed disposing of distilled alcoholic liquor; and to prevent abuses associated with saloons or resorts for the consumption of distilled alcoholic liquors.

ORS 472.060 follows:

"(1) For all purposes in connection with this chapter, the commission shall have and exercise all of the powers and be subject to the duties conferred upon it by the Oregon Liquor Control Act * * * and constitutional provisions, and the commission is hereby authorized and directed to administer and perform the duties provided by this chapter within and in accordance with the powers and duties prescribed in the Oregon Liquor Control Act * * *.

"(2) In addition to the functions, duties and powers vested with and possessed by the commission, the commission is hereby vested with the following functions, duties and powers:

"(a) To grant, refuse, suspend or cancel licenses for the sale upon licensed premises, by licensees, of distilled liquor for consumption on the premises;

* * *

"(d) To adopt such regulations as are necessary and feasible for carrying out the provisions of this chapter and to amend or repeal such regulations, and to exercise all such other powers, duties

and functions covered by this chapter, and all powers incidental, convenient or necessary to enable it to administer or carry out any of the provisions of this chapter."

Regulation 17, upon which the commission depended when it cancelled the plaintiff's license and which the plaintiff challenges as unauthorized, was adopted by the commission May 10, 1960. Its pertinent part follows:

"Section 1.

"Every commercial establishment licensed under ORS Chapter 472 must keep accurate daily records of account showing separately the amounts of all receipts from the sale of food and of alcoholic liquor on the licensed premises. Such records shall be kept available for examination by the commission * * *. The gross receipts from the sale of food by the licensee in such a licensed commercial establishment during every sixty-day period commencing after July 1, 1960, shall amount to not less than twenty-five per cent of the gross receipts from the sale of both food and alcoholic liquor in such commercial establishments * * *.

"Section 2.

"Commercial establishments, while open for business must provide regular meals during the usual hours when such meals are regularly served. They shall also, as a minimum provide short orders or other cooked food at all other times when alcoholic liquors are served."

The plaintiff possesses a Class "B" dispenser's license for his establishment which was issued to him by the commission. According to ORS 472.110 (3) a Class "B" dispenser's license "may be issued to commercial establishments where food is cooked and served." ORS 472.010 (3) defines the term "commercial establishment" as "a place of business where

food is cooked and served and having adequate and sanitary kitchen facilities for the preparation and serving of meals to the general public and having for that purpose proper and sanitary dining space."

The plaintiff testified that his establishment included a fully equipped kitchen and served chops, steaks, soup, sandwiches, french fries, chicken, pie and hamburger. He did not operate the food feature of the place himself, but testified "a woman has the kitchen." He added "she has it for nothing."

The opening hour of his establishment was 12 noon and the closing hour 2 a.m. The woman who operated the eating facility did not always arrive at opening time and sometimes did not appear until 1:00 or 2:00 p.m. According to the plaintiff the peak hour of his business was "around 1:00 o'clock at night" but there was "very little" demand for food at that hour. He also testified that during "the normal supper hours," 5:00 to 7:30 p.m., he did "very little business." Shortly he explained: "that trade I have there they don't eat too much food. They have a hard time getting to buy a drink. They don't buy food."

A previous paragraph of this opinion quotes the part of Regulation 17 which provides that:

> "* * * The gross receipts from the sale of food by the licensee in such a licensed commercial establishment during every sixty-day period commencing after July 1, 1960, shall amount to not less than twenty-five per cent of the gross receipts from the sale of both food and alcoholic liquor."

In the sixty day period after July 1, 1960, the plaintiff's records showed that he received $263.80 from food served in his place and $12,569.55 from the sale of liquor. Food served represented 2.1 per cent of

the gross receipts. The plaintiff swore "It's awfully hard to sell food in a place like that."

Before the commission adopted Regulation 17 it had sought in several ways, which the administrator for the commission, V. G. Van Bergen, mentioned, to induce licensees to increase the volume of their restaurant business. According to Mr. Van Bergen the commission had noticed over the years that "the operator who could sell food was generally the better operator." He added that the licensee who encouraged the sale of food had better control over his establishment and presented "less trouble with other types of violations that would involve disorderly premises and sales to minors and the general public nuisance feature." Before adopting Regulation 17 the commission gave extensive notice of a meeting of the commissioners which was planned for January 1960 in the course of which the commissioners would consider the wisdom of adopting the measure. During the meeting the commission took note of the experience in the state of Washington where a licensee is required to sell at least 50 per cent food. The commission became satisfied that the proposed measure was meritorious and that it would bring about a "better controlled outlet." The measure was adopted and became known as Regulation 17.

*State ex rel Billado v. Wheelock,* 114 Vt 350, 45 A2d 430, reasoned:

> "Because of the tendency of the use of intoxicating liquors to deprave public morals, it has come to be the generally accepted doctrine that the manufacture or sale of such liquors, and even their possession or use, is not a matter of 'common,' 'inherent,' or 'natural' right, but, if a right at all, is one held subject to the police power of the State; in other words, it is a mere privilege * * *."

*Crowley v. Christensen,* 137 US 86, 11 S Ct 13, 34 L Ed 620, as reiterated in *State ex rel Thornbury v. Gregory,* 191 Wash 70, 70 P2d 788, declared:

> "* * * There is no inherent right in a citizen to thus sell intoxicating liquors by retail. It is not a privilege of a citizen of the state or of a citizen of the United States. As it is a business attendant with danger to the community it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils."

Substantially the same view was expressed in *Gouge v. David,* 185 Or 437, 463, 202 P2d 489.

*Perry v. Oregon Liquor Commission,* 180 Or 495, 177 P2d 406, ruled:

> "* * * The regulation and control of the liquor traffic always has been, and, perhaps, always will be, a vexatious and difficult problem. The legislature in the exercise of its police power saw fit to create the 'Oregon Liquor Control Commission' and has delegated to it power to adopt rules and regulations to effectuate the purpose and spirit of the Act. * * *"

This court has recognized the comprehensive character of the statutory provisions above cited which grant to the commission the power to promulgate rules and regulations that will carry into effect the purposes of (1) Article I, § 39, Constitution of Oregon, (2) the Liquor Control Act (ORS 471.005 through 471.990) and (3) the Sale of Alcoholic Liquor by Individual Drink (ORS 472.010 through 472.320). *Gouge v. David,* supra; *Casciato v. Oregon Liquor Control Commission,* 181 Or 707, 185 P2d 246; *Perry v. Oregon Liquor Control Commission,* supra.

■ It will be noticed by reverting to the legislation

above reviewed that it confers upon the commission extensive power to promulgate rules and regulations. *Warren v. Marion County*, 222 Or 307, 353 P2d 257, points out "there is no constitutional requirement that all delegation of legislative power must be accompanied by a statement of standards circumscribing its exercise." However, the legislation now before us states with clarity the purposes which the rules and regulations to be written by the commission should serve and expresses the requisite standards. For example, one provision authorizes the commission to adopt whatever regulations "are necessary and feasible for carrying out the provisions of this chapter." Another declares "The commission has the powers and duties specified in this chapter, and also the powers necessary or proper to enable it to carry out fully and effectually all the purposes of this chapter." More than one of the sections state that their purposes are in part to prevent the recurrence of the evils and abuses associated with saloons. It is clear that the legislation under scrutiny does not desire saloons to stage a repeat performance in whole or in part. Not only does the act speak of the objective just named, but it and also the constitutional amendment envision the promotion of the temperate use of alcoholic beverages.

■ Obviously the commission, in writing rules and enforcing them, can not undertake anything contrary to the statute itself. But it can fill in interstices in the legislation (*Gouge v. David*, supra) and thereby aid the statute to accomplish its purposes. The legislature, in drafting an act, can not always foresee the developments that will occur when an agency created by it proceeds to administer the act. Such was the juncture of events that occurred in the case now

before us. Since the legislators can not peer far into the future they may confer upon an agency to which they entrust the administration of the act enacted by them power to write the needed rules when a crises threatens that is within the purview of the act.

It will be recalled that Article I, § 39, Constitution of Oregon, in making provision for the sale of alcoholic liquor by the glass authorizes such sales only in "commercial establishments where food is cooked and served." Clearly the voters, in making that amendment to our Constitution, had in mind restaurants and other eating places that were bona fide in character. It would be unreasonable to infer that any voter, in taking such an important step as amending our Constitution and inserting in it the term "where food is cooked and served," thought that a place which was nothing but a sham or a pretense would meet the Constitution's requirement. Hardly any collection of words has such a clear grassroots connotation as "where food is cooked and served." Even the words themselves seem to give forth a pleasant aroma that quickens the appetite. The words are important. The commission has no power to license any places except those in which "food is cooked and served"; therefore those words restrict and limit the licensing power of the commission. The words just quoted constitute a main feature of the constitutional amendment and if they fail to denote an eating place that does a substantial business the important duty which the constitutional amendment expected of them will be lost. It seems manifest that in using the words "where food is cooked and served" the voters thought of eating establishments as contrasted to saloons. The latter were establishments where the sale of alcoholic beverages was the principal or possibly the sole pursuit.

We think that the people, in adopting this constitutional amendment, had in mind places in which the cooking and serving of food was an important feature of the business. The amendment did not specify in precise terms the amount of food which should be cooked and served in the establishment, but detail is often missing from constitutional provisions. Such a provision need not be complete within itself and thereby be self-executing. It may be skeletal in nature and depend upon ancillary legislation to be enacted by the legislature. Article I, § 39, directs the legislature to "provide in such detail as it shall deem advisable" the needed particulars to enable the constitutional amendment to become operative.

The interpretation of an act by the agency entrusted with its administration is generally given careful consideration by the courts, *Gouge v. David,* supra. There can be no doubt but that the commission construes the "Sale of Alcoholic Liquor by Individual Drink" act as enjoining upon it the duty to prevent the recurrence of the evils that lurked in the saloon. In the latter, as we have noted, alcoholic beverages, if not the sole objects of sale, were the principal objects thereof.

It is clear from the testimony which was given by Mr. Van Bergen, of which we have taken notice, that the experience of the commissioners in administering the Sale of Liquor By The Drink act prior to the enactment of Rule 17 had satisfied them that a rule of that character was necessary to achieve better conditions in the establishments that sold liquor by the drink. The experience of the commissioners had shown them that places which promoted the sale of food were better operated and became involved in fewer un-

fortunate episodes than those which deemed the sale of food unimportant.

Other states administer rules and legislation similar to Regulation 17. We take the following from *Fernandez v. State Liquor Authority*, 306 NY 600, 115 NE2d 829:

> "Order of the Appellate Division insofar as it annuls the determination of the State Liquor Authority that the licensee has ceased to conduct a bona fide restaurant, reversed, without costs, and determination of the State Liquor Authority confirmed on the ground that the findings of the State Liquor Authority are supported by substantial evidence.

> "Appeal, insofar as it attempts to review the order of the Appellate Division annulling the determination of the State Liquor Authority which denied petitioner's application for the renewal license and remitting same to the State Liquor Authority for reconsideration, dismissed."

*Marshall v. O'Connell*, 285 App Div 855, 136 NYS2d 446, holds:

> "Inasmuch as the new matter set forth in appellant's answer has not been controverted by a reply, the same must be deemed admitted, Section 1292, Civil Practice Act. From these uncontroverted allegations of the answer it appears: that adequate and proper warning was given to the respondent, that investigators had twice visited the premises during the noon lunch hour, on February 13, 1953 and on June 10, 1953, and on those occasions found only one patron who was served with food. Respondent's books disclosed that for the period covered by the months of February, March and April, 1952, food sales amounted to $459.72, and during the same period beverage sales were $6,833.19; that during the months of March, April, May and June, 1953, food sales amounted to $408.27 and bar

sales to $9,912.63. Factual analysis shows the ratio of food sales to alcoholic beverage sales to be about 5%. While there appears to be no statutory provision or rule requiring any definite or mandatory ratio between food and beverage sales, we feel that the negligible amount of food sales as shown by the above figures, affords reasonable grounds for supporting the Authority's disapproval of the renewal application. See Fernandez v. State Liquor Authority, 306 N.Y. 600, 115 N.E.2d 829. We find that the Authority in making its determination that the respondent had ceased to operate a bona fide restaurant acted neither arbitrarily nor unreasonably."

■ Without engaging in further analysis we express our belief that the legislation above reviewed authorized the commission to adopt and promulgate Regulation 17. Evidence for which the plaintiff himself vouched establishes his violation of the regulation. Further, the plaintiff voiced no hope that he could meet the requirements of the regulation. The evidence indicates that after the commission had adopted Regulation 17 and after the passage of a short period had put into effect the sixty-day test period all licensees except a very few experienced no serious difficulties in meetings the demands of the regulation.

The plaintiff, citing precedents such as *Southern Pacific Co. v. Heltzel,* 201 Or 1, 268 P2d 605, calls attention to the fact that efforts had been made in the legislature to secure the enactment of a statute similar to Regulation 17 and that the efforts failed. The decision just cited states that courts can not always discern the reasons which persuaded the Legislative Assembly to reject measures, and held that in that case the reasons for the rejection were apparent. In the present case we can not make a similar statement. It may be that the legislature felt that it had

already expressed itself with sufficient clarity and that further legislation for the sole purpose of making clear that which was manifest was uncalled for.

We think that the validity of Regulation 17 has been clearly established and that likewise the plaintiff's violation of it is shown by testimony which is free from all challenge.

The assignment of error is sustained. The decree of the circuit court is reversed.

PERRY, J., dissents.