Argued September 9, reversed November 23, petition for
rehearing denied December 20, 1966
U. S. Supreme Court dismissed March 22, petition for
rehearing denied April 19, 1967

# ARDEN FARMS CO. ET AL *v.* STATE DEPART-
# MENT OF AGRICULTURE ET AL

420 P. 2d 379

*Clifton D. Royal,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Robert Y. Thornton, Attorney General, and Don Parker, Helen B. Kalil, and Harold E. Burke, Assistant Attorneys General, Salem.

*James H. Clarke,* Portland, argued the cause for respondents. With him on the brief were McColloch, Dezendorf & Spears, Bertrand J. Close, and Davies, Biggs, Strayer, Stoel & Boley, Portland.

Before PERRY, Presiding Justice, and SLOAN, GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

GOODWIN, J.

This is a declaratory suit to test the validity of a milk-price-stabilization rule promulgated by the State Department of Agriculture under the authority of ORS 583.405 to 583.545. The Department appeals a decree striking down the regulation.

Plaintiffs are engaged in the processing and sale of dairy products. They operate processing plants in Oregon and import a substantial portion of their milk requirements from outside the state. The remainder of their requirements are obtained from producers

within the state. Under ORS 583.006 (5) the plaintiffs are designated as "handlers."

In order to prevent the destruction of a state-wide milk-price-stabilization scheme, the Department promulgated Oregon Administrative Regulation 603-06-052,[1] which deals with the reporting by handlers of their plant utilization. Those handlers who use both Oregon-produced and foreign milk must report plant utilization of Oregon milk in the same proportion as their plant utilization of all milk for Class 1 (fluid milk) and Class 2 (cheese and other dairy products) uses regardless of their actual utilization of Oregon milk.[2] The circuit court held that the regulation was void on two counts: (1) it was an unconstitutional burden on interstate commerce; and (2) it was not authorized by statute. If the decree is right on either count it must be sustained.

■ It is not disputed that the legitimate exercise of a state's police power to protect the life, liberty, health or property of its citizens will be upheld against the claim of federal supremacy[3] even though the legisla-

---

[1] Oregon Administrative Rules, ch 603, 06-052. "UTILIZATION OF MILK BY OREGON HANDLERS. (1) 'Class 1 utilization' for the purpose of this section, means the total utilization of all Class 1 milk (includes but not limited to all such milk purchased, received, processed or sold) by an Oregon handler or first handler located in or doing business in a market area where a market pool has been established, regardless of the source or the location of the producers of the milk.

"(2) Each Oregon handler shall allocate utilization to his Oregon suppliers on the same percentage basis as his actual total plant utilization of Class 1 and Class 2 milk."

[2] The fact that milk is fungible makes the actual use of any given producer's milk irrelevant under a blend-price system.

[3] United States Constitution.

Article VI: "* * * This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land * * *."

Article I, § 8: "* * * The Congress shall have Power To

tion results in some incidental burden on interstate commerce. See *Milk Board v. Eisenberg Co.,* 306 US 346, 59 S Ct 528, 83 L Ed 752 (1939). The initial inquiry must therefore be whether any burden on commerce attributable to OAR 603-06-052 is so great as to place the regulation at cross purposes with the commerce clause. *Baldwin v. Seelig,* 294 US 511, 55 S Ct 497, 79 L Ed 1032, 101 ALR 55 (1935).

■ The Oregon Milk Stabilization Act was adopted for the declared purpose of assuring a wholesome product for the benefit of the consuming public, providing the necessary assistance and authority to maintain a stable milk market, and sustaining the economy of the dairy industry and the economic welfare of the state of Oregon. ORS 583.410 (1). All of these are legitimate state purposes. *Nebbia v. New York,* 291 US 502, 54 S Ct 505, 78 L Ed 940, 89 ALR 1469 (1934); *Baldwin v. Seelig,* supra. See also *Savage v. Martin,* 161 Or 660, 91 P2d 273 (1939).

The legislative scheme, insofar as pertinent to the questions presented here, contemplates a bookkeeping "pool" of all milk produced by Oregon farmers so that each will receive the same "blend" price regardless of the actual use of his milk by the handler. Milk handlers are required to report to the state administrator their respective Class 1 and Class 2 sales of milk. Each handler is charged by the pool the minimum producer prices for Class 1 and Class 2 milk established by the Department for all milk allocated by the handler respectively to Class 1 and Class 2 use. The amounts

regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes * * *."

See Hood & Sons v. Du Mond, 336 US 525, 69 S Ct 657, 93 L Ed 865 (1937), striking down a New York order denying a license to a milk distributor solely to prevent the export of milk to Massachusetts.

used by all the handlers in the pool for Class 1 purposes and the amounts used by all the handlers in the pool for Class 2 purposes are then averaged to arrive at a "blend price" which the pool pays to all producers for the milk supplied by them. The milk handlers serve as paymasters for the pool in making the "blend" payment to the producers. It makes no difference to a producer in the market pool how much of his milk the handler to whom he sells actually uses for Class 1 purposes. The handler using more than the market pool average for Class 1 purposes will withhold some money from its producers for the benefit of producers selling to a handler with less than average Class 1 usage. Thus, all pool producers are ultimately paid the same price per unit for their milk regardless of the actual use to which their milk was put. This kind of equalization is the goal of the pool system.[4]

To illustrate the effect of the challenged regulation within the context of the statutory scheme, suppose a handler who processes 100 units of milk is able to import only 40 units of foreign milk per month and must purchase his remaining 60 units from local producers. He operates at a plant-capacity level which makes it most profitable for him to allocate 50 units to Class 1 use and 50 units to Class 2 use. Without the regulation, a handler could buy foreign milk at lower prices than the pool price for domestic milk. He could allocate all 40 units (or 100%) of his foreign milk to Class 1 use. He then could allocate 10 units of his domestic milk to Class 1 use to make his 50 units for Class 1 purposes. Finally, he could allocate the remaining 50 domestic units to Class 2 use.

[4] See Curly's Dairy v. Dept. of Agriculture, 244 Or 13, 415 P2d 740 (1966), for a description of the pool system and its stabilizing effect upon milk prices.

The challenged regulation requires that for purposes of a determination by the domestic market administrator of the price to be paid for the milk purchased from domestic producers, a handler must report Class 1 allocation of domestic milk on the same percentage basis as his actual total plant allocation of Class 1 milk (i.e., 50%). Thus, he must report for purposes of determining the domestic price that he has allocated 30 domestic units (50% of 60 units of domestic milk) to Class 1 use and 30 domestic units to Class 2 use. The result of such report will tend to elevate the "blend price" which must be paid to all domestic producers. Presumably the blend price would have been depressed if the handler were allowed to report that all but 10 units of his domestic milk had been allocated to Class 2 uses. The regulation, therefore, does not permit a handler who avails himself of both domestic and foreign milk supplies to depress the Oregon pool, or the blend price, by reporting most of his domestic milk purchases as utilized for his Class 2 requirements.

Regardless of the amount of domestic milk which the handler actually allocates to Class 1, he must report to the Department as if he had allocated a percentage of domestic milk for Class 1 use equivalent to the proportionate amount of his total milk supply which he actually allocates to Class 1 use; and he must pay the blend price for his domestic milk regardless of his actual utilization of domestic milk.

■ Plaintiffs argue that the only course of action remaining open to them under the regulation is to reduce their volume of imported milk.

However, it is an economic fact of life that the volume of foreign milk the handler will buy will de-

pend primarily on the differential between the domestic blend price and the foreign wholesale price plus extra transportation costs, if any. Rather than to inhibit importation of foreign milk, the regulation would encourage it. A plant with a high volume of Class 1 utilization reporting its figures to the Oregon administrator in accordance with the regulation would tend to drive the Oregon blend price upward. This would result in a greater spread between the Oregon blend price and the presumably cheaper price elsewhere, encouraging the handler to seek the cheaper milk outside the state. At some point, of course, the influx of milk might produce plant surpluses which would force the plant to a higher volume of Class 2 utilization, but this would not be caused in any sense by the Oregon regulation.

In the case at bar, for example, the trial exhibits reveal that neither plaintiff has reduced its purchases from foreign producers since the publication of the challenged regulation. On the contrary, with the exception of Arden's out-of-state purchases in March, 1965, both handlers have increased the amounts of foreign milk bought monthly over corresponding months in 1964. Furthermore, the record shows that Carnation has not varied its practice of allocating 100% of foreign milk to Class 1 use, and Arden Farms, as late as April, 1965, allocated 93.89% of foreign milk to Class 1 use. Other potential variables, such as minimum prices in Oregon and the market-pool ratio of Class 1 to Class 2 use, have remained constant. The fact that foreign-milk purchases have risen since the publication of the regulation, without any change in the other possible variables, directly contradicts the assertion that the regulation has caused discrimination against, or an unreasonable burden upon, interstate

commerce. There is thus no factual support for the claim that Oregon has erected a trade barrier against competition from neighboring states.

The case of *Polar Co. v. Andrews,* 375 US 361, 84 S Ct 378, 11 L Ed2d 389 (1964), is distinguishable from the present case. The statute which was successfully challenged on commerce grounds in the *Polar* case provided, first, that any milk distributor in the Pensacola (Florida) Milk Marketing Area must pay a minimum price of 61 cents per gallon for all milk purchased from Pensacola producers and sold in Florida as "Class I" milk. Second, it established a method of allocation which resulted in all of Polar's Class I sales being attributed solely to its Pensacola producers. These statutory provisions had been construed to mean as well that a Florida distributor in a regulated marketing area must accept from his local producers all the milk tendered, including milk in excess of Class I needs. Finally, it prohibited termination (except for cause) of business relationships between a distributor and producer with whom the distributor has had a continuous course of dealings. The court, interpreting the statute, wrote:

"Under the controls challenged here, Polar must buy from its Florida producers, and pay 61 cents per gallon for it, an amount of raw milk equal to its Class I sales if it is available from these producers. If more than this amount is offered, Polar must also take the surplus at the lower established prices. And these obligations continue to bind Polar even though both its Class I needs and the surplus obtainable from Florida producers may steadily increase. Polar obviously will not and cannot use outside milk for those uses for which it is required to use Florida milk. Polar may turn to out-of-state sources only after exhausting the supply offered by its Pensacola producers. Under the challenged

regulations, an Alabama dairy farmer could not become one of Polar's regular producers and sell all of his milk to that company. Since he could not share in the Class I market—Pensacola producers are probably able to supply that market—his milk could command only the lower prices applicable to the less remunerative uses, prices which would not cover his cost of production." *Polar Co. v. Andrews,* 375 US at 375-376.

Florida attempted to pre-empt its market for its own producers to the exclusion of production from other areas. The attempt to prohibit the introduction within her territory of milk of wholesome quality acquired in another state was a direct burden on commerce.

In the case at bar the regulation has been aimed only at the reporting of utilization of foreign milk in such a way as to destroy the Oregon price structure.[9] No restriction has been placed upon the quantity of milk imported from out of state. Neither has any restriction been placed upon prices that must be paid for foreign milk. The decision of any Oregon handler, in view of economic realities, to import milk or to buy from local producers has not been altered by this regulation.

To come within the holding of the *Polar* case, Oregon's challenged regulation would have to require that handlers must purchase a minimum amount of Oregon-produced milk at Class 1 prices before the handlers could look to secondary sources of supply. This the Oregon regulation does not do. We are satisfied that any burden upon interstate commerce incidental to the preservation of the Oregon market pool is so negli-

---

[9] The challenged regulation has no application to an Oregon handler which imports 100% of its milk requirements from other states.

gible as to be barren of federal constitutional significance.

Contending that the Department is without authority to promulgate the challenged regulations, plaintiffs cite many cases for general propositions of statutory interpretation, none of which require this court to adopt their point of view. Simply stated, they argue that the legislature never intended to delegate authority to the Department of Agriculture to enact regulation which would assure a high or stable price structure for local producers of milk. The statute, according to this argument, merely provides a system of equalization and an agency to handle the accounting. If more had been intended, say the plaintiffs, the legislature would have been more specific.

The prime reason for rejecting this argument is that the whole system of equalization and the attempt to assure a sound market for local producers could be undermined if handlers were permitted to take advantage of the legislatively supported Class 1 retail market and at the same time actively depress the blend price to be paid Oregon producers.

It is clear that the Department seeks only to inhibit plaintiffs from using Oregon-produced milk for the purpose of depressing the Oregon blend price by allocating such milk almost entirely to Class 2 sales. The rule does not reduce competition from foreign producers nor does it regulate actual use of foreign milk by Oregon handlers. The rule requires, in the interest of price stability, that Oregon handlers do not report usage of Oregon milk for Class 2 purposes at a percentage rate grossly disproportionate from their actual plant-utilization ratio for all milk.

The legislature, intending primarily to stabilize the

market for producers, expressly clothed the Department with broad authority to make rules to maintain a stable milk market and to sustain the economy of the dairy industry. ORS 583.410. The manner in which the Department is to undertake the task (that is, through minimum prices, quotas, equalization, and market pooling) is found in ORS 583.505, 583.510, and 583.515. The Department's rule-making authority, found in ORS 583.026, provides:

"* * * [T]he department shall * * *

"* * * * *

"(b) Promulgate rules and regulations * * * after a public hearing relating to milk pooling, classification of use, allocation of classification, producer payments and contracts and such other rules as are reasonable and necessary for the enforcement of ORS 583.006 to 583.166

"* * * * *."

ORS 583.410 (2) provides:

"The provisions of ORS 583.002, 583.004, and 583.405 to 583.545 are in pari materia with the provisions of ORS 583.006 to 583.166 * * *."

■ We hold that the challenged rule is necessary, reasonable, and proper for the enforcement of the Oregon milk-marketing laws. *Curly's Dairy v. Dept. of Agriculture*, 244 Or 13, 415 P2d 740 (1966).

The rule bears a reasonable relation to the accomplishment of a valid legislative purpose. It is not arbitrary. There is no discrimination among handlers, since the formula treats all in the same class alike. Handlers who import all of their milk are exempt from the regulation. All handlers who import a portion of their requirements from foreign states and purchase the remainder of their needs from Oregon producers are treated alike. They are forbidden to use their Ore-

gon purchases to depress the Oregon blend price. See *Bailey Farm Dairy Co. v. Anderson,* 157 F2d 87 (8th Cir), cert. denied, 329 US 788, 67 S Ct 355, 91 L Ed 675 (1946). See also *Pressman v. Barnes,* 209 Md 544, 555, 121 A2d 816, 822 (1956).

The decree is reversed.