Argued March 4, affirmed June 15, 1966

# CURLY'S DAIRY, INC. ET AL v. STATE DEPARTMENT OF AGRICULTURE

415 P. 2d 740

*Dean Ellis,* Salem, argued the cause and filed a brief for the appellants.

*Helen B. Kalil,* Assistant Attorney General, Salem, argued the cause for respondent. With her on the

brief were Robert Y. Thornton, Attorney General, Don Parker, C. D. Royal, and Harold E. Burke, Assistant Attorneys General, Salem.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, GOODWIN and LUSK, Justices.

PERRY, J.

This is a suit brought by petitioners Curly's Dairy, Inc., and Lester W. Hagel for a declaratory judgment construing the provisions of ORS, Chapter 583, particularly ORS 583.510(2). The precise question is whether the Department of Agriculture (hereinafter referred to as the Department) has the authority under ORS 583.510 to establish separate pools for producers and producer-distributors within the same market area. The trial court held that the Department did have such authority and the petitioners have appealed.

In 1963 the Milk Marketing Act was enacted by the state legislature. ORS 583.405 to 583.545. This provided for regulation of milk production and marketing by the Department. The Department was directed to establish market areas, set up a system of pooling the milk in each market, determine quotas for producers and producer-distributors, and work out equalization of returns from milk sales to all producers of milk. An explanation of the operation of the system is stated by a witness as follows:

"I am setting out an example here showing three producers or producer-groups. It will be immaterial whether it was one producer or a hundred in each group. But this will represent producers or producer groups. Producer A and B and C. And we'll also have Handler A, B and C. And what I am going to illustrate here is the method of how the market pool works and how equalization comes

out of it. Now the first thing that we need to determine is sales. For this purpose we have sales equaling a hundred pounds of Class 1 milk, with Handler A selling 50 pounds, Handler B selling 30 pounds, and Handler C selling 20 pounds. Now, under the present method of allocation of quotas for each hundred pounds of sales in the market area, in the previous year, we are to allocate a hundred and fifteen pounds of quota, this is building in this 15% of surplus. Now, for purposes of simplification, we were going to say each one of these producers has exactly the same production. So, each producer would have a quota of 38–1/3 pounds. Each one of these producers in this illustration is going to produce 50 pounds—total milk—50 pounds of which 38–1/3 pounds is quota. So, we have a hundred and fifty pounds of milk to sell, and we have sold a hundred pounds of it in Class 1 which leaves us 50 pounds to dispose of in Class 2. Well, obviously, Handler A, who has already sold his 50 pounds in Class 1 will have no Class 2 sales. Handler B will have 20 pounds in Class 2, and Handler C will have 30 pounds in Class 2.

"Now, again, for simplification purposes, we will assume that the price of Class 1 milk is $5 a hundredweight, and Class 2 milk is $3 a hundred weight. So, Handler A then is obligated to pay to producers or to the pool as—whichever weight you want to place on it, but under the minimum price, he is going to have to pay $2.50 for this 50 pounds of milk he used as Class 1. Handler B will pay $1.50 for the 30 pounds of Class 1 milk, and 60¢ for the 20 pounds in Class 2. Handler C will pay a dollar for the Class 1 milk and 90¢ for the Class 2, so this handler's total obligation for the pool is a dollar and ninety cents. Handler B is two dollars and ten cents, and Handler C [sic] is two dollars and fifty cents. So, we have a total, then, of six dollars and fifty cents, total of all of the milk—of this hundred and fifty pounds of milk—as was sold under the minimum prices for six dollars and fifty

cents by three different handlers. So, the producers will be entitled to each receive exactly one-third of the six dollars and fifty cents, or two dollars and sixteen and two-thirds cents apiece.

"Now, this handler has sold his milk for $2.50, he only has to pay his producer two dollars sixteen and two-thirds cents. So, he sends to the state in the form of equalization, the oversale or over-amount of money that he has in his till of thirty-three and one-third cents. Each of the other two handlers have not sold their milk in a sufficient form to have enough money to pay their producers the pool blend price. This is what we call blend price, that came out of the pool by blending Class 1 price and Class 2 price on the sale of this hundred and fifty pounds of milk. So this thirty-three and and a third cents that he pays in comes over to these two handlers and six and two-thirds cents to Handler B, and twenty-six and two thirds cents to Handler C, and they in turn take the money and give it to their producers. So this is where we have said in previous testimony that the equalization money is actually not the handler's money, it is the producer's money. This six dollars and fifty cents belongs to the three producers involved, and this interchange of money is called equalization and the Department acts as a liaison or handler of that money—a trustee."

Originally the Department in administering the Act treated producers and producer-distributors exactly the same in a single pool. Subsequently, on June 17, 1964, the Department issued Administrative Order No. AD 10-64 establishing a different system for determining the quotas of producer-distributors. This order created separate market pools for producers and producer-distributors.

The petitioners assert that the Department has no statutory authority to promulgate such an order and that the order is, therefore, invalid.

Thus, the only issue for the court to resolve is whether ORS 583.510(2) allows the Department to establish separate pools for producers and producer-distributors. This is solely a matter of statutory construction.

The pertinent portion of the statute is as follows:

"(2) Thereafter the department shall establish a system in each market area for the equalization of returns for all quota milk whereby all producers selling milk to milk handlers in such market area, *and all producer-distributors selling or delivering milk in such market area,* will receive the same price for all quota milk utilized as Class 1 and Class 2 * * *." (Emphasis supplied)

The italicized phrase which is set off by commas is the center of the controversy.

Petitioners, it seems, have misunderstood the true issue. The bulk of their argument is based upon the assumption that the statute is unambiguous and that it clearly states that the Department has no authority. Thus, the cases relied on by petitioners (*Layman v. State Unemp. Comp. Com.,* 167 Or 379, 117 P2d 974, 136 ALR 1468; *Safeway Stores v. Milk Commission,* 197 Va 69, 87 SE2d 769; *Ideal Farms, Inc. v. Benson,* 288 F2d 608 (3rd Cir 1961)) are not in point unless it can be said the statute clearly does not confer the authority in question upon the Department.

There is no doubt that the legislature intended that producer-distributors were to be regulated under the Act. The only question is whether they may be treated in a different manner from producers. If the statute is clear and unambiguous, then the court may not resort to rules of statutory construction in ascertaining and declaring the legislative intent. *Berry*

*Transport, Inc. v. Heltzel,* 202 Or 161, 272 P2d 965. However, the statute under consideration is ambiguous as it is subject to two different interpretations.

Therefore, the court must construe the statute giving effect to the manifest intent of the legislature. *Sunshine Dairy v. Peterson et al.,* 183 Or 305, 193 P2d 543. The court may consider the language used, the object to be accomplished, extrinsic factors and numerous other items. *Sunshine Dairy v. Peterson et al.,* supra. The entire statute should be examined, including its preamble. *State ex rel. Peterson v. Woodruff,* 179 Or 640, 173 P2d 961. A statute is to be construed with reference to its manifest object, and, if the language is susceptible of two constructions, one which will carry out and the other defeat such manifest object, it should receive the former construction.

■ Further, the interpretation of an ambiguous statute by an agency charged with its administration is entitled to great weight, although it is not binding on the courts. *Van Ripper v. Oregon Liquor Con. Com.,* 228 Or 581, 365 P2d 109; *Gouge v. David, et al.,* 185 Or 437, 202 P2d 489; *City of Portland v. Duntley,* 185 Or 365, 203 P2d 640.

■ The core of the ambiguity in the instant case revolves around the punctuation of the statute, particularly to the commas setting off the phrase, "and all producer-distributors selling or delivering milk in such market area", from the prior phrase, "all producers selling milk to milk handlers in such market area," ORS 583.510(2). Punctuation marks are a proper guide to interpreting a statute and in ascertaining the legislative intent. *Mitchell v. Or. Wn. Credit & Coll. Bur.,* 188 Or 389, 215 P2d 917; *Godsoe v. Harder,* 164 Kan 86, 187 P2d 515.

A case which clearly illustrates the use of a comma

in statutory construction is *Weinacht v. Bd. of Chosen Freeholders County of Bergen,* 3 NJ 330, 70 A2d 69. That case concerned the construction of a New Jersey statute which provided separate plans and specifications shall be prepared for the various items of work to be done on public buildings. These included "plumbing and gas fitting, and all kindred work, and of the steam and hot water heating and ventilating apparatus, steam power plants and kindred work, and electrical work, *structural steel and ornamental iron work.*" (Emphasis supplied) 3 NJ 330, 332. The county had called for separate bids on structural steel and ornamental iron work to be done in constructing a hospital. It was contended that this was in violation of the statute. The court considered three factors in requiring that the bid must be let on structural steel and ornamental iron work as a single unit. The first was the punctuation of the statute. The omission of a comma after steel indicated the legislative intent. The court, 3 NJ 330, 334, stated:

"Today, however, statutes are punctuated prior to submission to the Legislature and:

" 'The better rule is that punctuation is a part of the act and that it may be considered in the interpretation of the act but may not be used to create doubt or to distort or defeat the intention of the legislature. When the intent is uncertain, punctuation, if it affords some indication of the true intention, may be looked to as an aid.' Sutherland, Statutory Construction (3d ed. 1943), § 4939."

The other factors which the court thought relevant were the trade customs prevailing at the time the statute was passed and the purpose underlying the statute. The primary objective of the statute was to encourage and promote competition and the evidence revealed that this purpose was best accomplished by combining

structural steel and ornamental iron work for a single bid.

■ In the instant case, the purposes of the statute include among others, (1) the maintenance of a stable milk market for the mutual benefit of the industry and the people of the state, and (2) to sustain the economy of the dairy industry and the economic welfare of the state. ORS 583.410. The only testimony in the record on this point reveals that the milk industry as a whole benefits from the two pool system, and in addition, the punctuation in the statute itself sets off the producer from the producer-distributor.

■■ Since we are satisfied the Department has properly construed the statute as intended by the legislature, the only remaining question is whether the Department is forever bound by its original establishment of its one pool system. The answer to this must be in the negative. Neither logic nor reason compels a court to hold a department to a prior ruling, which when made appeared compatible with the spirit of the act, but which subsequent events disclose will not serve as adequately as a new rule and which the Department was authorized by the act to have made in the beginning.

A proper hearing was held and the regulation and classification were reasonably based on the facts and within the authority of the Department to make. *Warren v. Marion County et al,* 222 Or 307, 313, 353 P2d 257 ; *Savage v. Martin,* 161 Or 660, 682, 694, 91 P2d 273.

The decree of the trial court is affirmed.