625 P.2d 1202

**KERR–McGEE NUCLEAR CORPORA-
TION and Kerr-McGee Corporation,
Appellants,**

v.

**PROPERTY TAX DIVISION OF the TAX-
ATION AND REVENUE DEPART-
MENT of the State of New Mexico, Ap-
pellees.**

**No. 3945.**

Court of Appeals of New Mexico.

April 29, 1980.

Certiorari Denied May 21, 1980.

Bruce D. Black, Campbell & Black, P. A., Santa Fe, for appellants.

Jeff Bingaman, Atty. Gen., Jan Unna, Taxation & Revenue Dept., Santa Fe, for appellees.

## OPINION

HERNANDEZ, Judge.

Appellants, Kerr-McGee Corporation (K–M) and Kerr-McGee Nuclear Corporation (Nuclear), protested the 1978 valuation of their respective uranium mining properties and appeal the decision of the Director of the Property Tax Division of the Taxation and Revenue Department (Division). They allege four points of error:

POINT I. Since the Property Tax Code taxes only tangible personal property, the Division erred in taxing certain mine development costs and work-in-progress accounts because they are intangibles.

POINT II. Even assuming that buried unsalvageable materials are tangible, Section 7-36-25 N.M.S.A.1978 exempts them from property tax because they support, and are included in the definition of, pits, shafts, or drifts, and are not improvements or subsurface structures.

POINT III. The Division erred in valuing taxpayers' dams, reservoirs, tanks and irrigation wells separately from the land they serve because Section 7-36-15(C) N.M.S.A.1978 states that they shall not be valued separately.

POINT IV. The Property Tax Division should be estopped from requiring K–M to include mine development costs in its tax base because it has not required their inclusion in the past.

*POINT I.*

Taxpayers are correct that the Property Tax Code levies a tax only on tangible property. Section 7–36–7(A), N.M.S.A. 1978, provides: "Except for the property listed in Subsection B of this section [none of the exceptions are applicable in this situation], all property is subject to valuation for property taxation purposes under the Property Tax Code if it has a taxable situs in the state." Section 7–35–2(G), N.M.S.A. 1978 provides: " 'property' means tangible property, real or personal." The Code does not provide a definition of "tangible" or "intangible".

Taxpayers argue that their mine development costs cannot be taxed under the Code because they are intangibles. We do not agree.

■ The Code taxes "improvements, equipment, materials, supplies and other personal property held or used in connection with all classes of uranium mineral property; * * * " Section 7–36–33(A)(1), N.M.S.A. 1978 provides for valuation of this type of property:

A. The following kinds of property shall be valued for property taxation purposes in accordance with the provisions of this section:

(1) all property used in connection with mineral property and defined * * * in Paragraph (1) of Subsection B of Section 7–36–25 NMSA1978; * * *

Next, § 7–36–33(C) tells how to value this type of property:

C. The value of individual items of property subject to valuation under this section, except construction work in progress, shall be determined as follows:

(1) the valuation authority shall first establish the *tangible property cost* of each item of property;

(2) from the tangible property cost shall be deducted the related accumulated provision for depreciation and any other justifiable factors. [Emphasis added.]

And the term "tangible property cost" is defined in Section 7–36–33(B)(5):

*"Tangible property cost" means the actual cost of acquisition or construction of property including additions, retirements, adjustments, and transfers, but without deduction of related accumulated provision for depreciation, amortization, or other purposes.* [Emphasis added.]

The testimony indicates that the items listed in taxpayers' accounts as "intangible development costs" are in fact costs of acquisition or construction of improvements, equipment, materials, supplies and other personal property held or used in connection with their uranium mineral properties.

■ However, taxpayers argue that these costs are in fact "intangible" development costs because the legislature adopted by reference the Internal Revenue Code concepts of "tangible" and "intangible" when it enacted Section 7–36–33(A)(1) and (B)(1)(2), N.M.S.A.1978. Section (A)(1) of 7–36–33 has been set out previously. Section B(1)(2) provides:

B. As used in this section:

(1) "depreciation" means the straight line method of computing the depreciation allowance as defined and used in Section 167 of the United States Internal Revenue Code of 1954, as amended or renumbered, over the useful life of the item of property; ·

(2) "useful life of the item of property" means the "class life" for same or similar kinds of property as defined and used in Section 167 of the United States Internal Revenue Code of 1954, as amended or renumbered; * * *

The words "tangible" or "intangible" are not used in Section 167 of the Internal Revenue Code let alone defined, and there is nothing in the language of Section 7–36–33(A)(1) or (B)(1)(2), supra, to indicate that the legislature intended to do more than adopt the I.R.C. § 167 straight line method of depreciation.

Federal Tax law provides for the expense deduction of certain development costs which would otherwise have to be capitalized. These costs have come to be known as "intangible development costs", but this designation is nothing more than a shorthand for the use of those concerned with that particular anomaly of federal tax law. It was clearly not the intention of the New Mexico legislature to incorporate any such distinction into the state's property tax structure.

■ Taxpayers next argue that those tangible materials which are incorporated into underground structures and which cannot be seen or touched and are not economically salvageable become intangible and thus not subject to taxation under the Code. The materials referred to are such things as roof bolts, grouting, concrete, steel mesh, timbers, tubing, and steel reinforcing rods. This is a novel argument. Taxpayers cite us no authority to support it and we know of none, and there is nothing in the Code which would allow such a taxable metamorphosis. Taxpayers contend that these materials are not taxable for yet another reason; and that is, that once they have been buried in the earth they cease to have value and "actually become a liability." It might well be that the underground structures into which these materials are incorporated will cease to have any taxable value after ore bodies have been exhausted. However, while there is ore yet to be removed such structures have utility and therefore have value. Section 7–36–25(B)(1), supra, clearly includes these materials in the valuation base:

B. The following kinds of property held or used in connection with uranium mineral property shall be valued under the methods of valuation required by the Property Tax Code [Articles 35 to 38 of Chapter 7 NMSA1978]:

(1) improvements, equipment, materials, supplies and other personal property held or used in connection with all classes of uranium mineral property; "improvements" as used in this section includes surface and subsurface structures, but

does not include pits, shafts, drifts or other similar artificial changes in the physical condition of the surface or subsurface of the earth produced solely by the removal or rearrangement of earth or minerals for the purpose of exposing or removing ore from a mine; and * * *

■ Taxpayers also contend that such things as labor, engineer and geological analysis, utility bills, and equipment rental fees are clearly not within any definition of "tangible", and that the Division erred in including these costs in their tax bases. Again, Section 7–36–33(B)(5), supra, defines "tangible property cost" as the actual cost of acquisition or construction of property. In discussing similar items of cost in paving a highway, the Supreme Court of Kansas said:

* * * Aside from the physical work of excavation, construction, and the furnishing of materials, there is a necessary expense of surveying, making blueprints, supervising the work as it progresses, and inspecting the materials used in making the pavement. Is this a proper charge in calculating the true cost of the improvement? This expense is called "engineering"; sometimes it is called "overhead". Whatever the name, it is a necessary item of expenditure. It would be a very costly economy, indeed it would be absurd, to undertake an expensive work of paving construction without this "engineering". *Bailey v. Henrion*, 108 Kan. 282, 194 P. 928 (1921).

We conclude that these costs meet the definition of tangible property cost set out in Section 7-36-33(B)(5), supra.

*POINT II.*

■ Taxpayers argue that even if these buried materials are tangible, they are exempted from property tax by Section 7-36-25(B)(1), N.M.S.A.1978 which provides:

B. The following kinds of property held or used in connection with uranium mineral property shall be valued under the methods of valuation required by the Property Tax Code:

(1) improvements, equipment, materials, supplies and other personal property held or used in connection with all classes of uranium mineral property; "improvements" as used in this section includes surface and subsurface structures, but does not include pits, shafts, drifts or other similar artificial changes in the physical condition of the surface or subsurface of the earth produced solely by the removal or rearrangement of earth or minerals for the purpose of exposing or removing ore from a mine; * * *

The decision of the Director of the Division was that Section 7–36–25(B)(1), supra, does not exempt or except any and all pits, shafts, and drifts, but only those which are produced (1) "solely by the removal of earth or minerals" and (2) "for the purpose of exposing or removing ore from a mine". The Director then concluded that only the cost of digging the shafts or drifts is exempt from tax, and that the cost of materials used to line the shafts or drifts are "improvements" and subject to tax. He determined that 38% of taxpayers' costs went into these materials and that 38% of the costs are thus subject to tax.

Taxpayers argue that a literal definition of shafts and drifts includes such supporting materials. Because, as their expert witnesses testified, the lining or supporting of shafts and drifts in most mines is an absolute necessity otherwise they would collapse. They said that this was especially true in the area where the taxpayers' mines are located. They also testified that ventilation shafts are mandated by mine safety regulations and that they serve a double purpose, the second purpose being as an escape shaft should the main shaft become obstructed. And the testimony indicated that leach holes are used for the very purpose of removing ore from a mine. The process involves pumping water down into a mine through a shaft ("leach hole") where the ore is mixed with the water, and then pumping the water containing ore particles back to the surface. All of this testimony was uncontradicted.

It is necessary to keep in mind, in analyzing the language of this section, that it applies to "strip" and "open pit" mining operations as well as underground mining operations when the minerals are extracted by means of tunneling and shafting. Looking at subsection (1) from the point of a strip or open pit mining operation we see the following: "does not include pits * * * or other similar artificial changes in the physical condition of the surface * * * of the earth produced solely by the removal or rearrangement of earth or minerals for the purpose of exposing * * * or removing ore * * * ". That is all of the operators costs in removing the over burden to reach the ore or removing it are exempt. Looking at this subsection from the point of view of an underground mining operation we see the following: "does not include * * * shafts, drifts or other similar artificial changes in the physical condition of the * * * subsurface of the earth produced solely by the removal or rearrangement of earth or minerals for the purpose of exposing or removing ore from a mine * * * " That is all of the operators costs in digging shafts and drifts to reach the ore or remove it are exempt. It is our opinion that the legislature did not intend such a result. Where distinctions have been intended in the Code the language to that effect has been specific. The legislature did not define pits, shafts, or drifts; therefore, it is apparent that their commonly understood meaning in the industry was intended. The uncontradicted testimony of the taxpayers' expert witnesses was that, in the industry, the lining or bracing of shafts and drifts is an integral and essential part and included within their very definition. We also believe that the legislature intended to include within the exemption ventilation air shafts, leach holes, and any other shafts necessary to the extraction of minerals.

*POINT III.*

The Director determined that the Division was correct in valuing taxpayers' dams, reservoirs, tanks, and irrigation wells separately from the land they serve, because Section 7‑36‑15(C), N.M.S.A.1978, states that they cannot be valued along with the

land they serve unless they are used "for irrigation or stockwatering purposes." Section 7–36–15(C) provides:

> Dams, reservoirs, tanks, canals, irrigation wells, installed irrigation pumps, stockwatering wells and pumps, similar structures and equipment used for irrigation or stockwatering purposes, * * * water rights and private roads shall not be valued separately from the land they serve. The foregoing improvements and rights shall be considered as appurtenances to the land they serve and their value shall be included in the determination of value of the land. [Emphasis added.]

Both the taxpayers and the Division argue that a grammatical analysis of the first sentence must be made. The Division argues that the phrase "used for irrigation or stockwatering purposes" modifies all words preceding it. The taxpayers argue that the type of punctuation used prior to the phrase "used for irrigation or stockwatering purposes" supports their argument that the phrase modifies only the words "similar structures and equipment."

We agree with the Division. The key word in the sentence is "similar". As used here it means "having characteristics in common: very much alike." Webster's Third New International Dictionary (Unabridged). The question that prompts itself is similar to or like what? To answer this you must of necessity look to the foregoing words which are either structures or equipment; "water rights" and "private roads" are neither one. It then becomes evident what kind of dams, reservoirs, tanks, etc., the legislature was referring to; those "used for irrigation or stockwatering purposes."

*POINT IV.*

■ Taxpayers' estoppel argument is without merit. Once Section 7–36–33, supra, was enacted and became effective on January 1, 1976 [Laws 1975, Ch. 165, § 14], the Division was under a statutory mandate to include mine development costs in taxpayers' tax base. Finally, taxpayers did not demonstrate that written opinions to the contrary were ever issued by the Division

[*Mountain States Advertising Inc. v. Bureau of Revenue*, 89 N.M. 331, 552 P.2d 233 (Ct.App.1976)], or that there was any discrimination on the Division's part.

*CONCLUSION.*

We affirm the Director's Decision in part, and reverse in part. This case is remanded with instructions to the Director to vacate his decision and issue another in conformity with this opinion.

Judges Andrews and Hendley agree with the disposition of Points I, II and IV but disagree with Point III and accordingly their opinion controls on Point III.

IT IS SO ORDERED.

HENDLEY and ANDREWS, JJ., concurring in part, dissenting in part.

HENDLEY, Judge (concurring in part and dissenting in part).

I concur in Points I, II and IV of Judge Hernandez' opinion. I disagree with Point III for the following reasons.

■ It is well recognized that in attempting to determine the plain meaning of a statute, it is often necessary to consider the punctuation used by the Legislature. *Moore v. Magor Car Corp.*, 27 N.J. 82, 141 A.2d 536 (1958). *See also City of Indianapolis v. Ingram*, 377 N.E.2d 877 (Ind.App. 1978); *Hayes v. State*, 247 A.2d 101 (Me. 1968); and *General Motors Corp. v. Erves*, 399 Mich. 241, 249 N.W.2d 41 (1976). A grammatical analysis is particularly appropriate where the core of the ambiguity revolves around punctuation. *Curly's Dairy, Inc. v. State Dept. of Agriculture*, 244 Or. 15, 415 P.2d 740 (1966). It is well established that where the Legislature uses commas, it seeks to create separate and independent parts. *Curly's Dairy, supra.* In *Labbe v. Nissen Corp.*, 404 A.2d 564 (Me. 1979), the Supreme Court of Maine stated: "A comma is generally used to indicate the separation of words, phrases, or clauses from others not closely connected in the structure of the sentence." In the instant case, if the Legislature had intended the

words "used for irrigation or stockwatering purposes" to modify all eight preceding parts of the sentence and thereby create an independent clause, it would have used a semicolon and not a comma to punctuate that section. *See Drinkwater v. State*, 69 Wis.2d 60, 230 N.W.2d 126 (1975). Therefore, a grammatical analysis, which both sides recognize as being dispositive, clearly warrants a finding in favor of the taxpayers.

This view is supported by New Mexico's long established rule that the meaning or area of application of a statute may be gleaned from its title. *City of Las Cruces v. Davis*, 87 N.M. 425, 535 P.2d 68 (Ct.App. 1975); *Harriett v. Lusk*, 63 N.M. 383, 320 P.2d 738 (1958). The section in question is found under the following title: "Methods of valuation for property taxation purposes; general provisions." If that section was to be limited to the two agricultural purposes discussed above, it would have more properly been placed within § 7–36–20, N.M.S.A. 1978, which is titled: "Special method of valuation; land used primarily for agricultural purposes." By incorporating subsection C under the general provisions section, as opposed to the more specific agricultural purposes section, it is apparent that the terms listed in § 7–36–15(C) were intended to be given a broader application than given to them in Judge Hernandez' opinion. This conclusion gains additional support by the fact that both §§ 7–36–15 and 7–36–20 were enacted by the Legislature the same day, as part of the same bill. *See* Laws of 1975, ch. 165, §§ 2 and 3.

A final reason is the long standing rule that any ambiguity in determining the appropriate means of valuating property for tax purposes is to be strictly construed against the state and resolved in favor of the taxpayer. *See Westland Corporation v. Commissioner of Revenue*, 83 N.M. 29, 487 P.2d 1099 (Ct.App.1971); and *Field Enterprises Educational Corp. v. Commissioner of Revenue*, 82 N.M. 24, 474 P.2d 510 (Ct.App. 1970).

Accordingly, the decision of the Director is reversed.

IT IS SO ORDERED.

ANDREWS, J., concurs.