674 P.2d 522

In the Matter of RANCHERS–TUFCO LIMESTONE PROJECT JOINT VENTURE (Severance Tax) Assessment No. 270283; Ranchers-Tufco Limestone Project Joint Venture (Compensating Tax) Assessment No. 151228; Todilto Exploration and Development Corporation (Severance Tax) Assessment No. 270284.

RANCHERS–TUFCO LIMESTONE PROJECT JOINT VENTURE, and Todilto Exploration and Development Corporation, Taxpayers-Appellants,

v.

REVENUE DIVISION, NEW MEXICO TAXATION AND REVENUE DEPARTMENT, Appellee.

In the Matter of RANCHERS HNG JOINT PROJECT, Assessment Nos. 151450, 260352 and 270293.

RANCHERS HNG JOINT PROJECT, Taxpayer-Appellant,

v.

REVENUE DIVISION, NEW MEXICO TAXATION AND REVENUE DEPARTMENT, Appellee.

Nos. 7225, 7093.

Court of Appeals of New Mexico.

Oct. 20, 1983.

Certiorari Denied Nov. 30, 1983.

Robert H. Clark, Margaret E. Davidson, Keleher & McLeod, P.A., Paull Mines Poole, Tinnin & Martin, P.C. Albuquerque, for taxpayer-appellant, Ranchers-Tufco Limestone Project Joint Venture.

Rex Throckmorton, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for taxpayer-appellant, Todilto Exploration and Development Corporation.

Paul Bardacke, Atty. Gen., Paula Forney-Thompson, Asst. Atty. Gen., Taxation and Revenue Dept. Santa Fe, for appellee.

## OPINION

WOOD, Judge.

This opinion decides the issues raised in the separate appeals in Nos. 7225 and 7093.

The tax collector (Revenue Division of the Taxation and Revenue Department) denied the protests of the taxpayers to certain tax assessments. The taxpayers appeal. We group the issues into four headings: (1) delay in deciding the protests; (2) severance tax; (3) resources tax; and (4) compensating tax. The severance and resources tax assessments involve uranium ore. The compensating tax assessments involve property brought into New Mexico and used at the taxpayers' mine operations where uranium ore was recovered.

There are three taxpayers:

(a) Tufco (Ranchers-Tufco Limestone Joint Venture) is "a joint venture between Ranchers Exploration and Development Corporation and Chaco Energy Company which is the successor in interest to Tufco, a subsidiary of Texas Utilities Fuel Company."

(b) Todilto (Todilto Exploration and Development Corporation, a New Mexico corporation).

(c) HNG (Ranchers HNG Joint Project) is a "joint venture comprised of Ranchers Exploration and Development Corporation and HNG Oil Company".

The tax assessments against Tufco and Todilto are for reporting periods April 1976 through June 1979. The tax assessments against HNG are for reporting periods March 1977 through June 1979. No issue is raised as to the reporting periods involved.

No issue is raised as to the arithmetic of the dollar amount of the assessments.

No issue is raised as to the applicable tax statutes. A reference to a statute is to the statute appearing in NMSA 1978. Because the issues primarily involve the meaning of the applicable statutes, amendments to those statutes, not involved in resolution of the issues, are not identified.

*Delay in Deciding the Protests*

The protests of Tufco and Todilto, which were timely, were filed in January 1980. An informal conference between the tax collector and these taxpayers was held on April 23, 1980. The formal hearing on these protests was not held until December 16, 1982.

The protests of HNG, which were timely, were filed in February and March 1980. The formal hearing on these protests was not held until November 18, 1982.

Prior to or at the formal hearing each taxpayer sought abatement of the assessments against it. The hearing examiner, on behalf of the Director of the Revenue Division, denied the protests.

The taxpayers claim that the assessments should have been abated because they were not given a prompt hearing on the protests. They rely on Section 7–1–24(D) which states: "Upon timely receipt of a protest ... the commissioner or his delegate shall promptly set a date for hearing and on that date hear the protest ...." We recognize that this statute is ambiguous; it requires that a *date* for hearing be set promptly; only by interpretation can we hold that the statute requires a prompt hearing. That, however, is not an issue in these cases.

The tax collector views the taxpayers' argument as a claim that because of delay it should be equitably estopped from collecting the assessments. The tax collector points out that estoppel does not apply, as a general rule, against the State. *See United States v. Bureau of Revenue,* 87 N.M. 164, 531 P.2d 212 (Ct.App.1975). The taxpayers respond that they have never relied on an estoppel concept and do not claim, in these appeals, that the tax collector is estopped. The equitable estoppel argument of the tax collector is a false issue and is not considered.

The taxpayers rely on Section 7–1–24(D); they claim that they have a statutory right to a prompt hearing, and the tax collector has deprived them of this statutory right. The parties dispute whether the tax collector violated the statute, arguing over the meaning of "promptly", whether the delay was reasonable, and whether a taxpayer has an affirmative duty to speed up the process. We need not discuss these items.

■ Assuming, but not deciding, that the tax collector violated Section 7–1–24(D), how does a taxpayer benefit from the violation? The statute says nothing as to the consequence of a violation. The general rule is that tardiness of public officers in the performance of statutory duties is not a defense to an action by the state to enforce a public right or to protect public interests. *State, ex rel. Dept. of Human Services v. Davis,* 99 N.M. 138, 654 P.2d 1038 (1982). The general rule is applicable in these cases unless Section 7–1–24(D) makes it inapplicable. Section 7–1–24(D) does not make the general rule inapplicable.

■ Even if the general rule did not apply, the taxpayers have not demonstrated that they have been harmed by the delay in deciding their protests. The taxpayers assert that the delay, in itself, was prejudicial because "we're uncertain as to what it's going to cost us in the future to produce uranium in the State of New Mexico, and how we can make a sales contract that will permit us to be competitive with other states and with other countries * * * *" They also assert: "The recall of potential witnesses has been clouded by the passage of time." These items were insufficient to show prejudice. *Compare State v. Duran,* 91 N.M. 756, 581 P.2d 19 (1978); *State v. Jojola,* 89 N.M. 489, 553 P.2d 1296 (Ct.App. 1976).

*Severance Tax*

The severance tax issues as to Tufco and Todilto involve the proper method of determining taxable value. The severance tax issue as to HNG involves a reimbursement for an increase in the severance tax.

A. *Determining Taxable Value*

■ The assessments of severance tax and interest against Tufco and Todilto are based on the tax collector's method of determining taxable value of uranium ore. Tufco and Todilto assert the tax collector's method is incorrect. This issue involves the interrelationship of two statutes.

**7–26–4. Determination of taxable value of natural resources.**

\*     \*     \*     \*     \*     \*

F. The taxable value to be reported for severed and saved uranium-bearing material is the sales price per pound of the content of $U_3O_8$ contained in the severed and saved or processed uranium, regardless of the form in which the product is actually disposed of. It is presumed, in the absence of preponderant evidence of another value, that the taxable value means the total amount of money and the reasonable value of other consideration received, or either of them, for the severed and saved uranium ore or processed uranium "yellowcake" concentrate. However, if the severed and saved uranium ore or "yellowcake" concentrate is not sold as ore or concentrate, the gross value shall be the value of $U_3O_8$ in ore or "yellowcake" concentrate represented in the final product. Taxable value shall be gross value without deduction of any kind.

**7–26–7. Severance tax on uranium.**

A. The severance tax on uranium is measured by the quantity of $U_3O_8$ contained in and recoverable from severed and saved uranium-bearing material whether that material is ore or solution, measured in a standard manner established by regulation of the commissioner of revenue. The taxable event is the sale, transportation out of New Mexico or consumption of the uranium-bearing material, whichever first occurs.

Section 7–26–7 provides the severance tax applies to "each pound of severed and saved $U_3O_8$ contained in severed uranium-bearing material". The tax is measured by taxable value per pound of $U_3O_8$; the tax rate

increases as the taxable value per pound increases.

Unchallenged findings of the hearing examiner state the factual background of the dispute as to the correct method of determining taxable value.

(a) Tufco and Todilto are separately engaged in the business of mining and selling uranium ore from underground mines in New Mexico. The severed uranium ore brought to the surface of the mine is "saved" as a uranium-bearing product which has value.

(b) The chemical formula for uranium in its natural state is $U_3O_8$. Raw uranium ore is milled in New Mexico to increase the concentration of $U_3O_8$. The product of the milling process is concentrated $U_3O_8$, called yellowcake. Neither Tufco nor Todilto owned a milling facility; they sold their raw ore to a third party. The third party did the milling which resulted in yellowcake.

(c) "During the milling process, some $U_3O_8$ is lost and becomes waste. The amount of recovered uranium from the milling process varies because ores from different sources react differently to chemical processes. For example, in milling the Todilto ore into yellowcake, the purchaser—Homestake—was able to recover only 81.7 percent of the $U_3O_8$ contained in the ore."

(d) Tufco and Todilto sold raw ore. The price paid by the third party for the raw ore was based on the $U_3O_8$ contained in the raw ore. "The agreements provided for an assay of the raw ore so that the $U_3O_8$ content of the raw ore could be determined before sale to the purchaser."

The taxable event, see Section 7–26–7, was the sale of raw ore to a third party. The price paid was based on $U_3O_8$ content in the raw ore and this was determined by assay prior to sale. Tufco and Todilto contend that taxable value is to be determined by the $U_3O_8$ content at the time of the sale. Under this approach, the $U_3O_8$ lost during the milling process is not involved in determining taxable value of what was sold in the raw state. The tax collector does not dispute that Tufco and Todilto sold raw ore,

unmilled. Nevertheless, the tax collector contends that taxable value is to be determined by $U_3O_8$ recovered after milling. Under this approach, the $U_3O_8$ lost during milling is involved in determining taxable value.

The difference in the contentions is significant. Under Section 7–26–4(F), the taxable value is based on sales price per pound. This is determined by dividing the poundage into the price paid. Tufco and Todilto would use the poundage sold as the divisor; the tax collector would use the poundage recovered as the divisor. The tax collector's "approach results in a higher tax because the divisor into the total amount received for the uranium ore sold is smaller than the Taxpayers' divisor. The result is that a higher price per pound * * * is achieved with a resulting higher tax rate * * * * "

The tax collector seeks to justify its position by reading certain words as interchangeable in the two statutes. Section 7–26–7 refers to $U_3O_8$ "contained in and recoverable from severed and saved uranium-bearing material". Section 7–26–4(F) refers to $U_3O_8$ "contained in the severed and saved or processed uranium". The parties do not dispute that the words "contained in" and "recoverable" are used interchangeably in Section 7–26–7. The tax collector asserts that "contained in" and "processed (recoverable)" are used interchangeably in Section 7–26–4(F). "The statute [7–26–4(F)] uses the disjunctive 'or' to indicate that the taxable value is to be determined by reference to either the 'recoverable' or 'contained in' amounts * * * * Thus, the terms 'contained in' and 'recoverable' have been equated by the legislature."

The tax collector misreads the statutes. The wording of the two statutes differs. Section 7–26–7 deals with how the tax is measured. Section 7–26–4(F) deals with taxable value. The measure of the tax is applied to taxable value; the measure applies only after taxable value is determined. Statutory wording as to the measure is not a basis for disregarding the wording as to taxable value.

Section 7–26–4(F) reads: "The taxable value to be reported for severed and saved uranium-bearing material is the sales price per pound of the content of $U_3O_8$ contained in the severed and saved or processed uranium * * * *" *United Nuclear Corp. v. Revenue Div., Etc.,* 98 N.M. 296, 648 P.2d 335 (Ct.App.1982), held that this language was unambiguous, and lack of ambiguity is the view of the tax collector at this point in these appeals. Section 7–26–4(F) states that taxable value is the *sales* price of $U_3O_8$ contained in severed and saved uranium or the sales price of $U_3O_8$ contained in processed uranium. There was no sales price for processed uranium; Tufco and Todilto did not sell processed uranium. The only sales price on which taxable value was to be reported was the price of the severed and saved raw unprocessed ore. The taxable event was that sale.

The hearing examiner determined taxable value on a taxable event that never occurred. The hearing examiner disregarded the uncontradicted fact that sales price was based on raw ore; it determined taxable value on the basis of recovered ore. If there had been a sale of processed uranium, then the taxable value would be based on the sale price for the processed uranium. That is not the situation in this case.

The tax collector seeks to avoid this result. The arguments and our answers follow.

(a) The assessments were presumptively correct. The presumption was overcome by the tax collector's misapplication of Section 7–26–4(F). *See* § 7–1–25(D)(3).

(b) Statutes are to be interpreted to be internally consistent; to interpret Section 7–26–4(F) to refer to $U_3O_8$ contained in the raw ore while interpreting Section 7–26–7 to refer to the $U_3O_8$ recoverable from the ore "would yield an internally inconsistent result since both sections refer to both contained in and recoverable amounts." This argument is based on the tax collector's misreading of the statute. Taxable value can be based on either the $U_3O_8$ contained in the raw ore or in the processed ore; it depends on the taxable event, in these cases, what was sold. Measuring the tax on the basis of recovered $U_3O_8$ is not inconsistent with determining taxable value on the basis of what was sold.

(c) Our holding is that taxable value, under the facts of this case, should have been determined on the basis of the $U_3O_8$ content of the severed and saved raw ore. The tax collector asserts this holding results in inconsistent treatment between those who sell raw ore and those who sell ore after it is milled into yellowcake. The tax collector also asserts that this holding is contrary to Section 7–26–4(F)

which states that the taxable value is to be based on the sales price for $U_3O_8$ content "regardless of the form in which the product is actually disposed of". This language indicates that the legislature intended that the taxable value reflect the $U_3O_8$ actually recovered whether the $U_3O_8$ was sold in ore or sold as $U_3O_8$.

These contentions are also based on the tax collector's misreading of the statute.

The form in which the product is sold may vary. It may be ore or solution. *See* § 7–26–7. The ore may be sold raw or after being milled into yellowcake. Section 7–26–4(F) provides that the form does not matter. Whatever the form, taxable value depends on sales price per pound of the $U_3O_8$ content contained in the uranium sold. The taxable event in this case was the sale. The taxable event could also be transportation out of New Mexico or the consumption of uranium-bearing material. Section 7–26–7. These taxable events can occur without any milling and thus without any processed ore. Should a taxable event occur without a sale, Section 7–26–4(F) provides that taxable value shall be gross value, and gross value may be the value of $U_3O_8$ in either raw ore or yellowcake. The provisions for determining taxable value are not tied to processed or "actually recovered" ore. Taxable value is tied to a taxable event and being so tied provides consistent treatment to all because taxable value depends on value at the time of the event triggering the tax.

The arguments of the tax collector in the foregoing paragraphs (b) and (c) represent a shift in position—from lack of ambiguity in Section 7-26-4(F) to the need for interpretation. If the tax collector is correct, and the statute requires interpretation, this approach works against the tax collector.

■ The issue is the proper method of determining taxable value. This issue does not involve a deduction or exemption from tax which is construed in favor of the taxing authority. *Reed v. Jones,* 81 N.M. 481, 468 P.2d 882 (Ct.App.1970). This issue involves the appropriate means of valuing property for tax purposes. Any ambiguity in the statute as to this situation is strictly construed against the State and resolved in favor of the taxpayer. *Molycorp, Inc. v. State Corporation Commission,* 95 N.M. 613, 624 P.2d 1010 (1981); *Kerr-McGee Nuclear Corp. v. Property Tax Division,* 95 N.M. 685, 625 P.2d 1202 (Ct.App.1980); *Westland Corporation v. Commissioner of Revenue,* 83 N.M. 29, 487 P.2d 1099 (Ct.App.1971); *Field Enterprises Educational Corp. v. Commissioner of Revenue,* 82 N.M. 24, 474 P.2d 510 (Ct.App.1970).

If the provisions of Section 7-26-4(F) concerning taxable value are ambiguous and require interpretation, the ambiguity is to be construed against the tax collector. Under this approach, our holding is the same; taxable value should have been determined on the basis of the $U_3O_8$ content of the severed and saved raw ore. The hearing examiner's decision as to taxable value is erroneous.

B. *Reimbursement for Increase in Severance Tax*

■ The assessment of severance tax and interest against HNG is based on amounts that HNG was reimbursed due to an increase in the severance tax.

HNG sold yellowcake to an out-of-state third party pursuant to a contract entered in 1976. The contract did not provide for a fixed dollar amount per pound of yellowcake; rather, price was determined by a pricing formula involving several factors. The contract did provide that if certain

taxes, including the severance tax, were increased subsequent to July 1, 1976, the increased taxes would be separately billed and the third party would reimburse HNG for the amount of the increased tax.

New Mexico increased the severance tax in 1977. The tax stated in Section 7-26-7(A) reflects the increased tax rate. We have not quoted this tax rate because it is not material to the issues presented.

The unchallenged findings of the hearing examiner outline HNG's procedures.

(a) At the time yellowcake was received by the third party outside of New Mexico, the third party received an invoice (invoice I) for the pounds shipped, on the basis of the pricing formula in the contract.

(b) After invoice I was paid, HNG paid severance tax on the basis of the amount received under invoice I.

(c) HNG then separately sent the third party another invoice. This invoice II was for "an amount equal to the incremental increase in severance taxes occuring [sic] after July 1, 1976." The third party then paid HNG on the basis of invoice II.

(d) HNG "did not report, and it did not pay severance tax ... on the amounts received * * * pursuant to invoice II's * * *"

(e) "Taxpayer [HNG] did not issue invoice II's to GSU [the third party] for severance taxes until after the uranium concentrate had been shipped out-of-state, title and risk of loss had passed, the initial invoice (invoice I's) for the uranium concentrate had been issued and paid, and Taxpayer [HNG] had paid severance tax on its receipts from invoice I's."

Under the above findings, HNG has obtained reimbursement from its purchaser for the amount of the tax increase, but has not paid severance tax on the amount reimbursed. The correctness of the assessment depends upon whether the severance tax applies to the amount reimbursed. This issue involves only the first level of reimbursement; additional tax for subsequent

reimbursements is not involved. *See United Nuclear Corp. v. Revenue Div., Etc.*

HNG asserts that the amount reimbursed is not part of the taxable value of the yellowcake sold; the assessment includes the reimbursement in taxable value. *See* § 7–26–4(F). *United Nuclear Corp. v. Revenue Div., Etc.* held that the definition of taxable value (the first sentence in Section 7–26–4(F)) was not ambiguous, "[i]t means that the taxpayer must include in the taxable value all monies, including the amount of severance tax that it has billed the customers." The hearing examiner relied on *United Nuclear Corp.* in denying the protest. HNG contends that *United Nuclear Corp.* is distinguishable on the facts, and the factual distinction results in that decision being inapplicable.

HNG's arguments, and our answers, follow.

(a) The reimbursement received by HNG was not consideration for the yellowcake.

HNG asserts that the taxable value of the yellowcake was established by the price in the 1976 contract, which was prior to the increase in the tax. It points out that the effective date of the sales contracts is not stated in *United Nuclear Corp.* It argues that the reimbursement it received due to the tax increase added nothing to the value. It also argues that the reimbursement provision in the 1976 contract could not have been designed to secure HNG any additional income; it was designed to ensure that HNG "might net * * * the same proceeds it would have realized if no tax increase had ever been passed." These arguments need not be answered on the basis of consideration under contract law because Section 7–26–4(F) presumes taxable value means the total amount of money received. Part of the money received pursuant to the 1976 contract was reimbursement for the increased tax. As *United Nuclear Corp.* points out, the amount added because of the tax is paid to get the goods (the yellowcake). Assuming, but not deciding, that the taxable value was established by the price in the 1976 contract, that price is not limited to the pricing formula but includes the

provision to reimburse HNG for the increased tax.

(b) Reimbursement of the tax increase is different from reimbursement of the total severance tax.

*United Nuclear Corp.* indicates that the contracts there involved provided for reimbursement of the entire severance tax. HNG's reimbursement was for the tax increase. HNG states that the customer's payment of 100% of the tax from the inception of the contract is appropriately characterized as consideration because, if not held to be consideration, the 100% pass-through shifts the incidence of the tax from the severer to the buyer. HNG asserts reimbursement limited to the tax increase does not increase the value of the yellowcake sold and provides no economic benefit to HNG. The implication in this argument is that if there is no change in value, there is no shift in the incidence of the tax. The legal incidence of the tax increase falls on HNG. *United Nuclear Corp.* It was HNG that received the reimbursement. The reimbursement was money received pursuant to the contract. The money received is presumed to be taxable value. A partial, rather than total, reimbursement does not change this presumption and provides no basis for HNG to be treated differently from the taxpayers in *United Nuclear Corp.*

(c) The statute deals specifically with reimbursements of increases in the severance tax.

This argument is based on Section 7–26–7(B), quoted in full in *United Nuclear Corp.* Section 7–26–7(B) provides that notwithstanding the tax increase provisions in Section 7–26–7(A):

[A] taxpayer may elect, prior to August 1, 1977, to register with the bureau [division] of revenue any bona fide arms length contract for the sale of uranium-bearing material entered into prior to January 1, 1977, which does not allow the taxpayer to obtain reimbursement for all of the additional taxes imposed by Subsection A of this section.

Sales pursuant to a registered contract have a lower tax rate through 1984. HNG does not claim that Section 7–26–7(B) applies to its sale contract. It cites this section because the above-quoted provision uses the word "reimbursement". It asserts that Section 7–26–7(B) recognizes that reimbursement in the statute means something other than consideration for the yellowcake sold.

HNG's argument overlooks the statutory wording. Taxable value in Section 7–26–4(F) is presumed to mean "the total amount of money and the reasonable value of other consideration received". Section 7–26–7(B) is consistent. It provides:

> The taxpayer's right to have his liability determined under this subsection shall terminate if the registered contract is or has been amended in any manner after January 1, 1977 and the effect of the amendment is to increase the total amount of money and the reasonable value of other consideration, or either of them, received * * * *

Section 7–26–7(B) does not exclude reimbursement for the tax increase from the total amount of money received; rather, it includes reimbursement for the tax increase within the total amount of money received.

(d) If the reimbursement for the increased tax is held to be part of the consideration, then HNG has established another value.

This argument involves the provision in Section 7–26–4(F) which reads:

> It is presumed, in the absence of preponderant evidence of another value, that the taxable value means the total amount of money and the reasonable value of other consideration received, or either of them, for the severed and saved uranium ore or processed uranium "yellowcake" concentrate.

HNG asserts that it established, by preponderant evidence, that taxable value was other than the total amount of money received. It relies on the pricing formula in the 1976 contract, reimbursement for the amount of the tax increase, the billing of the increase by separate invoice and its practice of treating the reimbursement as proceeds "separate and distinct from what it received for the uranium concentrate." The hearing examiner found this contention to be without merit; it could properly do so. The 1976 contract is substantial evidence supporting the hearing examiner's finding. Under the contract, the reimbursement is part of the money received for the sale of yellowcake.

(e) Including the reimbursement money in the taxable value is inconsistent with Section 7–26–7(A).

This argument is based on the schedule as to the amount of the tax which is set forth in Section 7–26–7(A). We do not quote the schedule; it is quoted in *United Nuclear Corp.* HNG's argument is that by imposing severance tax on the amount of the reimbursement, the tax exceeds that stated in the schedule. The argument is fallacious because HNG inserts the reimbursement money in the wrong place. HNG figures the tax on the reimbursement pursuant to the tax schedule; it should have included the reimbursement within taxable value per pound. The tax schedule is applied to taxable value per pound. When the reimbursement is included in taxable value per pound, there is no inconsistency.

The hearing examiner correctly denied HNG's protest of the severance tax assessment.

*Resources Tax*

HNG was reimbursed for the amount of the severance tax increase. It did not include the reimbursed amount in "taxable value" in figuring the resources tax. The assessment for resources tax and interest is based on this reimbursement. HNG claims this assessment was erroneous. Its arguments, and our answers, follow.

■■■ (a) Taxable value is the same under both the resources tax and the severance tax.

We agree. The definition of "taxable value" for both taxes is essentially the same. *Compare* § 7–25–3(I) with § 7–26–4(F). On the basis that the definitions are

essentially the same, HNG contends that its arguments for excluding the reimbursed severance tax from taxable value for severance tax purposes also apply in excluding the reimbursed severance tax from taxable value for resources tax purposes. We have answered these arguments in holding that the reimbursement was not excluded for severance tax purposes; the answers need not be repeated in holding that the reimbursement is not excluded for resources tax purposes.

■ (b) Tax calculations required if the tax collector's position is upheld results in inordinate administrative difficulties.

The claim of inordinate administrative difficulties is based on the interrelationship of three taxes on natural resources. The three taxes are the severance tax, the resources tax and the oil and gas conservation tax. See § 7–30–5(C). HNG points out that a reimbursement for the increased severance tax increases taxable value for both the severance tax and the resources tax. HNG describes this as "a never-ending cycle of one tax increasing the other (which in turn increases the first) * * * *" HNG then points out that in case of uranium, taxable value under the oil and gas conservation tax is based on the taxable value for resources tax purposes. HNG states: "There is absolutely no way a taxpayer of average intelligence could calculate his extractive tax liabilities with this three-tax relationship."

No issue of inordinate administrative difficulties was raised at the formal hearing. Section 7–1–25(A). The absence of any issue as to the interrelationship of the three taxes is illustrated by the unchallenged finding: "[T]he Taxpayer contends that the Department's position makes it impossible to make normal tax calculations. However, it was agreed by all parties that if the Department's positions on the tax assessments are correct, the taxes have been correctly calculated."

Here, HNG seeks to raise an administrative burden issue for the first time in the appeal, but has conceded that the assessment involved in the appeal has been cor-

rectly calculated. The question of administrative burden is not an issue in this appeal.

■ (c) Time of attachment of the taxes.

HNG asserts that if the taxable event for the severance and resources taxes is the same event, so that the two taxes attached simultaneously, the taxes do not apply to each other. On this basis, HNG contends that the reimbursement for the severance tax is not includable in taxable value for purposes of the resources tax. This argument overlooks the fact that the legal incidence of both taxes is upon HNG. See United Nuclear Corp. and § 7–25–4. In a similar situation, Gurley v. Rhoden, 421 U.S. 200, 95 S.Ct. 1605, 44 L.Ed.2d 110 (1975), stated: "[E]ven if the liability for the excise taxes did arise simultaneously with the sales tax, we cannot see any legal distinction, constitutional or otherwise, arising from that circumstance."

Alternatively, HNG argues that the two taxes did not arise simultaneously, that each tax is based on a different taxable event. Assuming, but not deciding, that there were different taxable events, HNG fails to recognize that each tax is imposed on taxable value at the time of the taxable event. Taxable value for each of the taxes is based on the total amount of money received. The money received, under each tax, includes the reimbursement for the increased severance tax.

The hearing examiner correctly denied HNG's protest of the resources tax assessment.

*Compensating Tax*

The assessments of compensating tax, interest and penalty against Tufco and HNG are based on property purchased outside of New Mexico but used in New Mexico in the mine operations of the two taxpayers in severing uranium ore. Neither taxpayer reported or paid any compensating tax as to this property. There are two issues: Liability for compensating tax, and liability for the assessed penalty. We hold that the taxpayers are not liable for the compensating tax. Accordingly, we do not consider

arguments as to the propriety of assessing a penalty.

The Resources Excise Tax Act provides for three taxes—resources tax, processors tax and service tax. Sections 7–25–4, 7–25–5 and 7–25–6. Both taxpayers are subject to the resources tax; both are severers of natural resources and are taxed for the privilege of severing natural resources.

Section 7–9–35 provides an exemption for persons subject to the Resources Excise Tax Act. The exemption reads:

> When a privilege tax is imposed by the Resources Excise Tax Act [7–25–1 to 7–25–9 NMSA 1978], the provisions of the act shall apply and determine the full measure of tax liability for the privilege of engaging in the business stated in the act and no provision of the Gross Receipts and Compensating Tax Act shall apply to or create a tax liability for such privilege, except as is provided in Section 7–25–8 NMSA 1978.

The exception to the exemption in Section 7–25–8 applies to nonfissionable natural resources and is not applicable.

The tax collector contends that Section 7–9–35 is simply not involved. This contention is based on the view that the property purchased out-of-state was not subject to the resources tax and thus Section 7–9–35 is not applicable. This contention is frivolous. The resources tax, Section 7–25–4, is based on the taxable value of natural resources; it is not based on the component parts of the property used in severing the natural resources.

Section 7–9–7, the compensating tax, imposed a tax on the privilege of using property in New Mexico. There is no dispute that both taxpayers used the property in New Mexico, Section 7–9–3(L), and that this property was used as an integral part of their mining operations.

Tufco and HNG claim they are exempted from the compensating tax by Section 7–9–35. The hearing examiner ruled that the exemption did not apply because the privilege taxed by the resources tax is not the same as the privilege taxed by the compen-

sating tax. We do not agree with the hearing examiner.

Section 7–9–35 provides:

(a) The privilege tax imposed by the resources tax determines the full measure of tax liability for the privilege of engaging in the business of severing natural resources.

(b) No provision of the Gross Receipts and Compensating Tax Act creates a tax liability for "such privilege", which is the privilege of engaging in the business of severing natural resources.

(c) No provision of the Gross Receipts and Compensating Tax Act applies to "such privilege".

■ The tax collector would subdivide a taxpayer's activity into various categories so that the word "privilege" in Section 7–9–35 would be given a very narrow meaning. Under the tax collector's approach, the privilege of severing natural resources is one privilege, and the privilege of using property in New Mexico is another. If successful in this approach, the tax collector could then argue that the privilege of severing natural resources is distinct from selling the severed resources so that there would be no exemption from the gross receipts tax. However, such a distinction, for gross receipts tax purposes is foreclosed. *J.W. Jones Construction Co. v. Revenue Division, Dept. of Taxation and Revenue,* 94 N.M. 39, 607 P.2d 126 (Ct.App.1979), held:

> It [Jones] is liable for any resources tax unpaid on materials extracted from contractor-designated pits and used on the highway projects. Concommitantly, Jones is entitled to the exemption from gross receipts tax of the amount of contract receipts attributable to its use of contractor-designated pit material * *

See also *Carter & Sons, Inc. v. N.M. Bureau of Revenue,* 92 N.M. 591, 592 P.2d 191 (Ct.App.1979); *Patten v. Bureau of Revenue,* 86 N.M. 355, 524 P.2d 527 (Ct.App.1974).

Inasmuch as Section 7–9–35 applies to exempt from the gross receipts tax the receipts from sale of severed resources, should the compensating tax be treated dif-

ferently? The tax collector contends the compensating tax should be treated differently because, if not, "no tax at all will be charged by New Mexico on the purchase of the equipment." This argument disregards the fact that no gross receipts tax will be collected on the sale of the natural resources severed.

 We recognize that the incidence of the gross receipts tax is on the seller, Section 7–9–4(A), and the incidence of the compensating tax is on the buyer, Sections 7–9–7 and 7–9–9. *See Edmunds v. Bureau of Revenue,* 64 N.M. 454, 330 P.2d 131 (1958). However, *Western Electric Co. v. N.M. Bureau of Revenue,* 90 N.M. 164, 561 P.2d 26 (Ct.App.1976), states: "[T]he legislature intended to make our gross receipts tax and our compensating tax correlates: an exemption from the gross receipts tax must also be treated as an exemption from the compensating tax." *Compare Union County Feedlot, Inc. v. Vigil,* 79 N.M. 684, 448 P.2d 485 (Ct.App.1968).

Section 7–9–35 states that no provision of the Gross Receipts and Compensating Tax Act applies to the "privilege of engaging in the business" when the resources tax applies. The business of both taxpayers is severing natural resources. The definition of "severing" includes mining or producing any natural resources in New Mexico for sale or profit. Section 7–25–3(H). Property used in the mine operations of the taxpayers as an integral part of the mining operation is used in the business of severing. *See Carter & Sons, Inc. v. N.M. Bureau of Revenue; Patten v. Bureau of Revenue.*

The statement in Section 7–9–35 that *no provision* of the Gross Receipts and Compensating Tax Act applies is similar to the "in lieu of" provision discussed in *Santa Fe Downs, Inc. v. Bureau of Revenue,* 85 N.M. 115, 509 P.2d 882 (Ct.App.1973). The hearing examiner's decision, that the exemption did not apply, is erroneous.

The decision denying the protests of Tufco and Todilto to the severance tax assessments is reversed. The decisions denying

the protests of Tufco and HNG to the compensating tax assessments are reversed. The decision denying the protests of HNG to the severance tax and resources tax assessments is affirmed.

If the taxpayers are to be treated fairly, Tufco and Todilto should recover their appellate costs, and HNG should recover a portion of its appellate costs. However, such fairness is foreclosed by the Supreme Court's interpretation of Section 7–1–25(B) in *New Mexico Bureau of Revenue v. Western Electric Co.,* 89 N.M. 468, 553 P.2d 1275 (1976). Accordingly, no appellate costs may be recovered. *See Addis v. Santa Fe Cty. Valuation Protests Bd.,* 91 N.M. 165, 571 P.2d 822 (Ct.App.1977).

IT IS SO ORDERED.

HENDLEY and DONNELLY, JJ., concur.